FILED

2012 MAR 21  AM 11: 35

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY_____

1  Anne Richardson, Esq. [S.B. #151541]
   Reem Salahi, Esq. [S.B. #259711]
2  HADSELL STORMER KEENY
         RICHARDSON & RENICK, LLP
3  128 North Fair Oaks Avenue
   Pasadena, California 91103-3645
4  Telephone:  (626) 585-9600
   Facsimile:  (626) 577-7079
5  Email: arichardson@hskrr.com
   Email: reem@hskrr.com
6

7  Ameena Mirza Qazi, Esq. [S.B. #250404]
   Fatima Dadabhoy, Esq. [S.B. #263484]
8  COUNCIL ON AMERICAN-ISLAMIC
   RELATIONS, CALIFORNIA
9  2180 W. Crescent Avenue, Suite F
   Anaheim, California 92801
10 Telephone: (714) 776-1847
   Facsimile: (714) 776-8340
11 Email: aqazi@cair.com
   Email: fdadabhoy@cair.com
12

13
   Attorneys for Plaintiff
14 ISLAMIC CENTER OF THE SOUTH BAY, LOS ANGELES

15            UNITED STATES DISTRICT COURT
16            CENTRAL DISTRICT OF CALIFORNIA

17

18 ISLAMIC CENTER OF THE            Case No.: **CV12-2418** JAK
19 SOUTH BAY, LOS ANGELES,                                (FMx)
                                    **COMPLAINT FOR INJUNCTIVE**
20            Plaintiff,            **RELIEF, DECLARATORY RELIEF**
                                    **AND DAMAGES:**
21       v.
                                    1. Permanent Injunction;
22 CITY OF LOMITA; Don Suminaga;    2. Violation of Religious Land Use and
23 Ken Blackwood; Margaret Estrada;    Institutionalized Persons Act
   James Gazeley; Henry Sanchez, Jr.;   (Substantial Burden on Religious
24 Michael Savidan; Ben Traina; DOES    Exercise; Discrimination; Equal
25 1-10,                                Terms; Unreasonable Limitation)(42
                                       U.S.C. § 2000cc et seq.);
26            Defendants.           3. Violation of the Free Speech, Free
27                                     Exercise of Religion and Freedom of
                                       Assembly Clauses of the First and
28                                     Fourteenth Amendment (42 U.S.C. §

1

1983);
4. Violation of the Equal Protection Clause of the Fourteenth Amendment (42 U.S.C. § 1983);
5. Violation of the California Constitution's Liberty Speech Clause, Freedom of Assembly, Religious Liberty, and Equal Protection (Art. I, §2, §3, §4, § 7); and
6. Declaratory Relief.

1

**INTRODUCTION**

2      Plaintiff Islamic Center of the South Bay, Los Angeles ("ICSB" or the

3  "Islamic Center") is a religious institution as defined by the Religious Land Use

4  and Institutionalized Persons Act of 2000 ("RLUIPA"), 42 U.S.C. § 2000cc et seq.

5  ICSB alleges as follows:

6      1. This action seeks to vindicate and safeguard Plaintiff's civil rights.

7  Defendant City of Lomita (the "City") and Defendant City officials have prevented

8  ICSB from renovating its property, negatively and substantially impacting its

9  congregants' ability to assemble, worship, and hold religious services.  In doing so,

10  Defendants have impermissibly burdened Plaintiff's religious exercise, expression,

11  and association, and violated Plaintiff's rights under the Free Exercise, Free

12  Speech, Free Assembly, and Equal Protection Clauses of the United States and

13  California Constitutions, and the RLUIPA.

14      2. Plaintiff seeks permanent relief enjoining the City, its employees,

15  successors and agents, and all persons subject to its direction and control from

16  depriving Plaintiff of its constitutional rights as guaranteed by the United States

17  and California Constitutions and from depriving Plaintiff of its rights under the

18  RLUIPA.  Plaintiff seeks a declaration under 28 U.S.C. §§ 2201 and 2202 that

19  Defendant City's land use and zoning laws, both on their face and as applied to

20  Plaintiff at the time of its application and denial, were unconstitutional.  Plaintiff

21  seeks reasonable costs of litigation, including attorney's fees and expenses.

22  Finally, Plaintiff seeks compensatory and nominal damages.

23

**JURISDICTION AND VENUE**

24      3. This Court has jurisdiction over this action under 28 U.S.C. §§ 1331

25  and 1343.  Declaratory relief is authorized under 28 US.C. §§ 2201 and 2202.

26  This Court has supplemental jurisdiction over the state law claims under 28

27  U.S.C. § 1367(a).

28      4. Venue is proper in this Court under 28 U.S.C. § 1391(b) because

1 | Defendants reside in, and all incidents, events, and occurrences giving rise to this
2 | action occurred in, the County of Los Angeles, California.

### PARTIES

#### A. **Plaintiff**

5. Plaintiff Islamic Center of the South Bay, Los Angeles ("ICSB") is a religious institution, and a nonprofit corporation organized and existing under the laws of the State of California. It is presently located within the City of Lomita, County of Los Angeles, California. It has operated as a mosque and held public worship services at its current location in Los Angeles County since 1985. Its religious community includes a congregation of approximately 150 to 200 American Muslim congregants who live in and around the City of Lomita. The congregants include local business owners, medical professionals, lawyers, engineers, and teachers who service and financially contribute to the South Bay communities. Its purpose is to engage in religious exercise by operating a mosque, conducting regular worship, prayer, study circles, as well as funeral, memorial, and wedding services, family activities, weekend school, teaching Islamic doctrine and history, and supporting Islamic youth groups, all pursuant to Islamic religious precepts.

#### B. **Defendants**

6. Defendant City of Lomita is an incorporated municipality located in Los Angeles County. The City's governing body consists of a five-member City Council ("Council"). The City acts through its Council, its officials, employees and official bodies and is empowered by virtue of the State of California to regulate and restrict the use of land and structures within the City's borders. The Council is empowered to make the final decision on requests to amend the General Plan and applications for a Zone Change.

7. Defendant Don Suminaga was the Mayor of the City of Lomita at all times material herein, from November 2009 to November 2010. On information

4

1   and belief, Defendant Suminaga is, and was at all relevant times, a resident of

2   Los Angeles County, California.  Defendant Suminaga is being sued in his

3   individual capacity only.

4          8. Defendant Ken Blackwood was a member of the Lomita City Council

5   at all relevant times herein.  On information and belief, Defendant Blackwood is,

6   and was at all relevant times, a resident of Los Angeles County, California.

7   Defendant Blackwood is being sued in his individual capacity only.

8          9. Defendant Margaret Estrada was a member of the Lomita City Council

9   at all relevant times herein and is currently Mayor Pro-Tem of the City of

10  Lomita.  On information and belief, Defendant Estrada is, and was at all relevant

11  times, a resident of Los Angeles County, California.  Defendant Estrada is being

12  sued in her official and individual capacities.  One other Council Member who

13  presided over the denial of the application, Timothy King, has since passed away.

14         10. Defendant James Gazeley is currently serving as Mayor of the City of

15  Lomita.  On information and belief, Defendant Gazeley is a resident of Los

16  Angeles County, California.  Defendant Gazeley is being sued in his official

17  capacity only.

18         11. Defendant Henry Sanchez, Jr. is currently serving as a member of the

19  Lomita City Council.  On information and belief, Defendant Sanchez is a resident

20  of Los Angeles County, California.  Defendant Sanchez is being sued in his

21  official capacity only.

22         12. Defendant Michael Savidan is currently serving as a member of the

23  Lomita City Council.  On information and belief, Defendant Savidan is a resident

24  of Los Angeles County, California.  Defendant Savidan is being sued in his

25  official capacity only.

26         13. Defendant Ben Traina is currently serving as a member of the Lomita

27  City Council.  On information and belief, Defendant Traina is a resident of Los

28  Angeles County, California.  Defendant Traina is being sued in his official

1    capacity only.

2        14. At all times, Defendants have been, are presently, and will be, acting

3    under the color and authority of the laws of the United States and the State of

4    California.

5        15. Plaintiff is informed and believes, and on this basis alleges, that at all

6    times herein mentioned, each of the Defendants was the agent, servant, and

7    employee of each of the remaining Defendants, and at all times here mentioned,

8    each was acting within the time, place, course and scope of said agency and

9    employment.  All of the acts of Defendant City, its officers, agents, servants and

10   employees, as alleged here, were conducted under color and pretense of the

11   statutes, policies, regulations, ordinances and customs and usages of Defendant

12   City.

13       16. Plaintiff is unaware of the true names and legal capacities of the

14   Defendants sued here as DOES 1 through 10 and, therefore, sue those Defendants

15   by such fictitious names.  Plaintiff will amend its complaint to allege their true

16   names and capacities when the same has been ascertained.  Plaintiff is informed

17   and believes, and on this basis alleges, that each DOE Defendant is in some way

18   legally responsible for the acts, omissions, and damages alleged here to have

19   been caused by each remaining Defendant.

20                           **STATEMENT OF FACTS**

21       17.  ICSB is currently housed on four parcels south of Pacific Coast

22   Highway ("PCH") and between Walnut Avenue and Appian Way in Lomita,

23   California as an integrated use.  ICSB has been located at 25816 Walnut Street in

24   Lomita, California since it acquired the property in 1985.  At that time, the lot

25   was zoned as Commercial-General or Low Density Residential (R-1).  ICSB

26   originally obtained a Conditional Use Permit in 1985 in order to function as a

27   religious institution.  In 1988, 1999 and 2001, ICSB purchased the parking lot

28   property located off of Pacific Coast Highway (PCH) and the adjacent properties

1 located at 25829 1/4, 25833 and 25833 ½ Appian Way.  As ICSB purchased

2 these properties, the fixed structures on the properties, some as old as 80 years,

3 were added to the Center, creating a decentralized sprawl of small disconnected

4 buildings and open spaces over time.

5      18. ICSB is bound to the south by single family residential homes and an

6 apartment complex.  To the east and west, ICSB is bound by both single-family

7 and multi-family homes and businesses.  To the north, ICSB is bound by various

8 retail enterprises, including a 7-11 convenience store, a pizza shop, and a pet

9 shop.

10      19. In 1989, the City rezoned the properties located along PCH and at

11 25816 Walnut Street and 25829 ¼ Appian Way from Commercial General or

12 Low Density Residential to Commercial-Retail (C-R).  This changed the property

13 from a permitted conforming use to a legal non-conforming use.  According to

14 Lomita's Zoning Ordinance, religious facilities are not conditionally permitted

15 uses within the C-R zone.  ICSB has since been a legal, nonconforming property,

16 grandfathered-in by its previously conforming use.  In 2008, ICSB began the

17 process of renovating and unifying its nearly eight buildings strewn on the

18 approximately acre and a half lot.  ICSB first submitted an application to the City

19 of Lomita's Planning Commission, which was approved in 2009 after great delay

20 and considerable mitigation efforts due to neighbor concerns.  Several months

21 later, in March 2010, Lomita's City Council unanimously denied ICSB's

22 application despite the Planning Commission's and City Staff's recommendation

23 for approval.

24      20. ICSB's renovation efforts were highly politicized and the City

25 organized multiple community meetings discussing the project with neighbors.

26 A small, but vocal, group of neighbors organized in opposition to the project by

27 lobbying City officials and making public statements opposing the project at the

28 multiple hearings.  Indeed, City staff has repeatedly referenced neighbor concerns

1   as a strong basis for the City's denial of ICSB's application.

2       21. To date, ICSB has been unable to renovate or unify its facilities into a

3   single house of worship to accommodate the religious needs of the congregation,

4   thereby substantially burdening the religious practice of ICSB's congregants.  Its

5   facilities remain inadequate, resembling a refugee camp rather than a religious

6   institution.

7       **The Religious Significance of an Islamic Center or Mosque**

8       22. In Islam, the faith of ICSB's congregants, the building and

9   maintaining of a mosque is a faith practice in and of itself.  Of particular

10  importance is the establishment of regular prayers in mosques.  Muslims are

11  commanded to worship God communally.  Maintaining a strong, cohesive

12  community that worships and performs good deeds together, is a faith practice

13  within Islam.  Muslims use the mosque as a place of community and for

14  collective worship and religious performance.

15      23. Prayer is deemed one of the most important tenants of the Islamic

16  faith.  While prayer takes many forms, generally "prayer" is referred to as the

17  five mandated daily prayers.  Muslims believe that prayer in congregation,

18  especially at a mosque, is rewarded multifold.  Squeezing into prayer spaces to

19  participate in congregational prayer is discouraged in Islam.  Islamic tradition

20  encourages Muslims to pray where they find a place in the mosque without

21  squeezing between people already seated or standing.

22      24. Cleanliness, including both personal hygiene and ritual purity, is very

23  important in Islam and is considered "half of the faith" of the practicing Muslim.

24  Muslims often wear clean clothes and socks before going to the mosque to

25  prevent offense to other Muslims and shower or perform ablution before entering

26  the mosque or the prayer hall to be in a state of ritual purity.

27      25. Gaining religious knowledge through educational programs and

28  activities is imperative to Islamic practice.  Islamic centers and mosques often

1    serve as places of religious education through youth groups, study groups,

2    weekend schools, or Islamic schools, which are often tied to mosques.

### The Burden on ICSB's Religious Practice Due to the Dilapidated Facilities

5    26. ICSB's religious practice is substantially burdened by the inadequate

6    facilities as discussed herewith. ICSB is home to approximately 150-200

7    American Muslim congregants.  It is the only mosque in the City of Lomita.

8    Currently, the Islamic Center consists of approximately eight disjointed small

9    houses on approximately an acre and a half lot that have been transformed into

10   different functioning buildings, including a prayer hall, a library, classrooms, one

11   outdoor patio which serves as a common and dining area, two bathrooms with

12   *wudu* facilities (used for ritual washing before the daily prayers), and a kitchen.

13   The decades-old buildings lack basic amenities including air conditioning. The

14   only facility for meals at the Center is an outdoor space consisting of tables

15   covered with a tarp.  This area is also the only common area other than the prayer

16   hall, and is used for large meetings including youth group discussions.

17   27. The facilities at ICSB inadequately service the needs of the

18   community.  For example, Muslim congregants are required to pray towards the

19   *qibla*, which is North-East in the direction of Mecca.  The prayer hall, which was

20   transformed from an old house, faces North and is inefficiently structured with

21   columns and angled walls that unnecessarily limit the number of congregants that

22   can fit in the hall during congregational prayers.  Congregants who pray within

23   the hall are forced to squeeze, bend and twist during prostration, and often cannot

24   even see or hear the person leading the prayer.  Because of the unusable space,

25   some women pray in a separate building and listen to sermons through a

26   television set which often malfunctions and excludes women from participating

27   in the communal prayers or benefitting from the sermons.

28   28. Congregants are distracted in prayer by the lack of usable space.

1   While praying, congregants should focus on the portions of the Qur'an they are

2   reciting and their connection to God.  Rather, congregants have expressed that

3   they spend their prayer thinking about where to place their head during the

4   prostration (*sujood*) since they are tightly squeezed in the congregation; they go

5   through the motions without the true benefit of prayer.  Consequently, some

6   congregants prefer to pray at home where they have room and are able to focus

7   on prayer and not in congregation in order to avoid the discomforts of the prayer

8   hall.

9       29. The prayer space, which by Islamic mandate must be pure and clean,

10   for women with small children doubles as classrooms.  Children wear shoes and

11   engage in activities in the same area where women prostrate and pray, causing

12   the space to be adulterated and wholly unsatisfactory for prayer.

13      30. Additionally, before any prayer, recitation of the Qur'an or attendance

14   of a religious discussion, Muslims are required to perform ablution, or cleansing

15   of one's person (*wudu*).  ICSB only has approximately eight (8) indoor and five

16   (5) outdoor ablution stations for its congregants, resulting in long lines and delays

17   in participating in religious activities.  The ablution stations are physically

18   separate from the prayer hall, forcing congregants to walk the distance between

19   the two facilities and exposing them to impurities and dirt from the vehicular

20   traffic that passes through the area.   This is especially burdensome on the

21   elderly, the physically disabled, and mothers who must accompany their children

22   to the ablution stations.

23      31. In the winter and rainy months, congregants are particularly burdened.

24   Congregants enter the prayer hall wet and muddy, adulterating the prayer hall.

25   As there is insufficient room within the prayer hall to store congregants' shoes,

26   congregants remove their shoes outside of the prayer hall which become

27   drenched and unwearable.

28      32. Currently, there is insufficient parking for congregants.  The spaces

1    are tight and few in number.  Many congregants must park on the street and walk

2    blocks to attend services at the mosque.  This is particularly burdensome on

3    Fridays during the midday (*jum'ah*) prayer, when many individuals leave work

4    during their lunch period to attend the prayer.  Due to the limited parking, many

5    congregants are delayed in attending prayer and in returning to their jobs after the

6    commencement of prayer.

7         33. The common area at ICSB is equally inadequate and burdensome.

8    ICSB only has an outdoor uninsulated area covered by plastic sheeting.  This

9    space is used for meals, youth group meetings, assemblies and other

10   programming.  In the Muslim holy month of *Ramadan*, when Muslims fast from

11   sunrise to sunset, ICSB's congregants gather outdoors in the uninsulated common

12   area to break fast and participate in a communal meal as part of religious

13   practice.  Families and children are precluded from participating in these

14   communal meals and activities during the cooler and hotter months.  Despite the

15   Islamic Center's attempts to put up tents and install outdoor heaters, many

16   congregants opt to not brave the cold to participate in the communal and

17   congregational activities like the breaking of fast in *Ramadan*, and stay home

18   instead.

19        34. Because there is no general meeting hall and a prayer space

20   unconducive for congregational prayer, ICSB cannot offer substantive programs

21   to benefit its membership.  ICSB is relegated to merely providing prayer services

22   to the exclusion of necessary and religiously-mandated social services and

23   educational programs, commonly provided at other Islamic institutions.  Muslim

24   teens and young adults are at risk of becoming disconnected from ICSB without

25   such relevant programming.

26        35. Similarly, at times, ICSB cannot promote or host interfaith activities

27   due to the lack of adequate facilities, including restrooms, a meeting hall, or a

28   communal space that is not exposed to the elements and the noise of the

1  outdoors.

2      36. Furthermore, due to ICSB's inadequate classroom and youth group

3  space, teachers and educators are reluctant to work in the deficient facilities –

4  negatively impacting the Islamic education that congregants are able to receive.

5  For parents who send their children to the Islamic Center, they find the lessons

6  about cleanliness in Islam and the respect and dignity of worship severely

7  contradicted by ICSB's subpar facilities.

8      37. Many parents have expressed concerns about bringing their children to

9  ICSB.  They fear for their children's safety as the Islamic Center is open and cars

10  can enter the premises, as can strangers.  Parents also fear neighbors complaining

11  about the noise of the children, whose activities are necessarily outdoors.

12  Without a single structure, there is insufficient space within ICSB that insulates

13  the noise of the children traveling between classrooms, the prayer hall, and the

14  bathrooms.  Children are consequently deprived the opportunity to learn

15  fundamental aspects of their religion, from congregational prayer to Islamic

16  history.  They are similarly deprived community and the ability to interact and

17  befriend other Muslim youth.

18      38. Because of the debilitated facilities, ICSB has had difficulties

19  attracting a religious leader (*imam/sheikh*) to lead the Islamic Center.  A religious

20  leader ensures the cohesiveness of the community, leads prayers, conducts

21  wedding ceremonies, teaches classes, gives sermons, counsels congregants and

22  oversees the daily functions of the mosque.  Without a religious leader, ICSB is

23  less relevant to the congregants and does not provide the necessary services

24  required of an Islamic institution.

25      39. The current state of ICSB's facilities is substantially burdensome on

26  the congregants' exercise of their religion.  The mosque is segregated and dirty

27  due to its exposedness.  Congregants describe it as undignified and "backwards

28  looking," and feel like second-class citizens in Lomita.  The facilities are

extremely damaging to the reputation of the mosque community, and do not accurately reflect their religious principles to the neighbors, community leaders, interfaith partners, youth, and spiritual seekers.  Frustration is rampant amongst congregants and some have left the Lomita community to move to cities with more adequate religious facilities.  Others drive far distances, even to Orange County, to attend better and more adequate Islamic institutions and mosques.

### Lomita's Zoning Ordinances

40. California state law grants the City the authority to adopt and administer zoning laws, ordinances, rules or regulations, as well as implement such general plans as may be in effect in the City. CAL.GOV.CODE. § 6500, *et seq.*

41. Title 11 of the City of Lomita's Municipal Code ("LMC") pertains to the City's zoning and planning ordinances and divides the City into twelve zoning districts.  LOMITA, CAL., CODE § 11-1.20.01.

42. Changes to zones and altering of district boundaries may be made by amendments to the Chapter 1 of Title 11. LOMITA, CAL., CODE § 11-1.70.01. This chapter is known as the Zoning Ordinance ("LZO"). LOMITA, CAL., CODE § 11-1.10.02.

43. LZO defines uses permitted as of right and those permitted only through prior conditional use permit or variance.  LOMITA, CAL., CODE §§ 11-1.30.01, 11-1.40 *et seq.*  The City's zoning scheme is permissive:  any use in any zone must be specifically permitted by the Zoning Ordinance and subject to all regulations and conditions of the Zoning Ordinance.  LOMITA, CAL., CODE § 11-1.10.04.

44. According to the LZO at the time of Plaintiff's application and denial, religious institutions were not specifically permitted in all of the City's twelve zones.  They were and continue to be permitted through the use of Conditional Use Permits ("CUP") in all three zones classified as Residential, i.e. A-1

13

1    (Agriculture, Noncommercial), R-1 (Single-Family Residential) and RVD

2    (Residential Variable Density).  They were and continue to be permitted in the

3    following Commercial Zones with a CUP:  C-S-P (Commercial, Service,

4    Professional), C-N (Commercial, Neighborhood), and C-G (Commercial,

5    General).  Whereas, Private Clubs and Lodges were allowed to be built in the C-

6    R (Commercial, Retail) Zone subject to a CUP, religious institutions were

7    precluded from said zones.

8         45. Religious institutions were required to comply with additional

9    requirements known as Special Development Standards, which Private Clubs and

10   Lodges were not subject to.  LOMITA, CAL., CODE §§ 11-1.30.01, 11-1.40 *et*

11   *seq.*

12        46. The Special Development Standards required religious institutions to

13   have a minimum lot area of 20,000 square feet.  Houses of worship exceeding a

14   300 person occupancy limit were required to have a minimum street frontage of

15   100 feet.  Churches in Commercial Zones were required to have front and rear

16   setbacks of at least 10 feet plus an additional foot of setback for each foot of

17   building height in excess of 20 feet.  The front setbacks were also required to be

18   landscaped.  Additional setbacks in the side yards were required to be at least five

19   feet plus one additional foot for each foot of building height in excess of 20 feet.

20   With respect to parking lot facilities, churches were required to provide

21   landscaping, and those in commercial zones may be required to build perimeter

22   masonry walls at the discretion of the Planning Commission.  Religious

23   institutions were also required to conduct traffic studies in cases where vehicle

24   access was from a street with a right-of-way 50 feet wide or less.  LOMITA,

25   CAL., CODE § 11-1.68.04.

26        47. Defendant City completely prohibited and continues to prohibit new

27   places of worship from locating in a Commercial Retail zone or from locating in

28   a residential (R-1) district without a conditional use permit subject to special

14

1   conditions, in violation of ICSB's free exercise, free speech, freedom of

2   assembly, and its rights under the RLUIPA.

3        48. In 2012, the City revised its Municipal Code to include the definition

4   of "Assembly Hall" which includes clubs, lodges, meeting halls, religious

5   facilities, auditoriums, theaters and "similar kinds of facilities used for

6   congregation purposes, whether available for public or private use." Ordinance

7   Approving Amendments to the Lomita Municipal Code to Amend the

8   Nomenclature for Religious and Assembly Uses and to Standardize Development

9   Criteria for Assembly Uses in all Zones, attached as Exh. A. The revisions

10  included the elimination of lot area, street frontage, and setback criteria for

11  religious facilities and the application of relevant development standards to all

12  assembly uses.

13        49. In its proposed ordinance, the City concedes the revisions were made

14  to equalize treatment of religious and nonreligious facilities. The City Council

15  approved the revisions in January 2012.

16        **ICSB'S Application For Renovation and Consolidation of Its Facilities**

17        50. Due to the inadequacy of the aging and segregated facilities, ICSB

18  began to fundraise and develop plans to renovate and unify its multiple buildings

19  into a single structure. In September 2008, Architect Shakil Patel submitted an

20  application for a single structured Islamic Center in lieu of the multiple disjointed

21  facilities to the City's Planning Commission. In the following months, Mr. Patel

22  worked with the City staff, various agencies and neighbors to revise the

23  application according to their recommendations. Among other things, Mr. Patel

24  was informed that the City could not locate ICSB's original CUP; therefore,

25  ICSB was required to apply from scratch rather than simply revise the existing

26  CUP authorizing ICSB to have a worship center.

27        51. On or around February 25, 2009, the City's Public Safety Traffic

28  Commission reviewed the Islamic Center's proposed renovation and determined

1   that the project would improve the existing neighborhood traffic flow.  The City

2   staff wrote in their Planning Commission Report that the "site is suitable for the

3   facility and is so arranged to avoid traffic congestion and prevent adverse impacts

4   on the neighborhood."  P.8, attached as Exh. B.  They similarly wrote in their

5   City of Lomita City Council Report, "After completion of the proposed project,

6   the traffic study found that the project would not create any additional impact

7   versus existing conditions.  Furthermore, the parking area will be reconfigured to

8   a more efficient design which will facilitate vehicles off of the right-of-way

9   quicker, thus further reducing any potential of traffic impacts."  P. 6, attached as

10   Exh. C.

11   52. An initial environmental study was prepared in accordance to the

12   California Environmental Quality Act ("CEQA") guidelines and was made

13   available for public review on May 19, 2009.  The initial study found that the

14   renovation of ICSB would result in no significant adverse effects and City staff

15   recommended that a negative declaration be adopted.

16   53. On June 8, 2009, ICSB had its first public hearing before the Planning

17   Commission.  The Planning Commission is considered the technical arm of the

18   City.  The hearing was well attended and controversial.  Both those supporting

19   the project and against it testified, and after hours of testimony, the Planning

20   Commission tabled ICSB's application and directed it to work with the

21   surrounding neighbors to address concerns over parking, building size and traffic.

22   54. Subsequently ICSB, at the request of the Planning Commission,

23   helped organize two community meetings on July 1, 2009 and August 12, 2009,

24   which were noticed to the surrounding neighbors within 300 feet of ICSB.

25   Approximately 15 people attended the first meeting and 26 the second.  At the

26   meetings, neighbors requested that ICSB negotiate use of the nearby Methodist

27   Church's parking lot for additional parking, reduce the height of the minaret to 35

28   feet, erect a silhouette structure as a visual aid of the height and width of the

1  proposed structure, add additional landscaping on the south/east areas of the

2  property, and eliminate all foot traffic from Appian Way, a residential side street.

3  ICSB complied with all the requested alterations to its proposal.

4      55. Specifically, ICSB reduced the size of the building from 16,851 to

5  14,320 square feet and added more parking.  It increased the setbacks of the

6  mosque and reduced the height of the minaret by five (5) feet to 35'6'.  ICSB

7  eliminated all foot traffic from Appian Way and negotiated a renewable one-year

8  lease with the neighboring Methodist Church for additional parking on Friday

9  during the *jum'ah* prayer.  ICSB's plan included 65 parking spaces, an excess of

10  16 spaces from what the zoning ordinance requires.  ICSB added more

11  landscaping to create a visual buffer with the surrounding properties and further

12  reduce any noise impact.  It created a separate home for the religious leader

13  outside of the main Islamic Center building designed in craftsman style

14  architecture to blend in with the surrounding neighborhood and raised the

15  windows on the second floor to protect neighbor privacy.

16      56. On September 14, 2009, a year after ICSB submitted its application to

17  the Planning Commission, the Commission held a second public hearing on the

18  mosque's application for renovation and consolidation of its facilities.  ICSB had

19  revised its site plan many times at a significant expense to ICSB.  The substantial

20  alterations to its plan were based on the suggestions of ICSB's neighbors and

21  City staff.  In its application, ICSB requested an amendment to the City of

22  Lomita's General Plan Land Use Map from Commercial to Low Density

23  Residential and an amendment to the City's Zoning Map from C-R to R-1 for the

24  properties located at 25816 Walnut Ave and 25829 ½ Appian Way; a zone text

25  amendment allowing "parking lots and parking buildings" as a conditionally

26  permitted use in the C-R Zone; a conditional use permit to allow a religious

27  facility within the R-1 Zone; a site plan review to permit a side yard setback of 3'

28  instead of the code required 20' and a rear yard setback of 7' instead of the code

1   required 20'; and a request for a variance from the Zoning Ordinance to allow

2   ICSB to include a minaret that has a height of 35'6' rather than the maximum

3   height of 27' (collectively, "land use entitlements").  The Lomita Zoning

4   Ordinance has since eliminated the lot area, frontage and setback criteria,

5   including the required 20' side and rear yard setbacks.

6        57. While the City staff recommended the project for approval, a small

7   but organized group of opponents made public comments at the hearing against

8   the project.  The opposition continued to express concerns over traffic, parking,

9   foot traffic and the incompatibility of the architectural design of the proposed

10  mosque, despite the many mitigation efforts undertaken by the Islamic Center

11  and the changes that were made in accordance to neighbors' suggestions.

12       58. After hours of public comment, the Planning Commission discussed

13  the project.  Planning Commissioner Kaneen stated the Commission had received

14  comment about the traffic problem in that area for years, but the complaints

15  mainly involved Fleming Middle School and Eshelman Elementary School, and

16  the Islamic Center had never been mentioned in relation to the traffic issues.

17  Commissioner Servino stated that the traffic problems were not the fault of the

18  Islamic Center, and that if the project was not approved, the situation would only

19  worsen.  Commissioners Dever and Kaneen remarked how the project had

20  polarized the community.  The Planning Commission ultimately voted to

21  recommend City Council approval of all the proposed land use entitlements for

22  the ICSB project.  Defendants Savidan and Gazeley, then seated on the Planning

23  Commission, voted against the project's approval.

24       **Planning Commission's Findings and City Staff Recommendations**

25       59. Had the City not rezoned the ICSB properties to C-R in 1989, ICSB

26  would have only needed City Council approval of a zone text amendment

27  allowing "parking lots and parking buildings" as a conditionally permitted use in

28  the C-R Zone.  The Planning Commission had the jurisdiction to approve the

1  remainder of the land use entitlements, specifically a conditional use permit to

2  allow a religious facility within the R-1 Zone; a site plan review to permit a side

3  yard setback of 10' instead of the code required 20' and a rear yard  setback of 7'

4  instead of the code required 20'; and a request for a variance from the Zoning

5  Ordinance to allow ICSB to include a minaret that has a height of 35'6' rather

6  than the maximum height of 27'.

7      60. Because of the need for a zone change and thus a general plan

8  amendment, legislative actions requiring City Council authorization, the Planning

9  Commission could only recommend approval of the land use entitlements based

10  on its technical and land use expertise and study of ICSB's application.

11      61. Pursuant to the Planning Commission's recommendation for approval,

12  the City staff drafted proposed resolutions and ordinances for the City Council's

13  approval.  In its proposed Resolution to the City Council approving the General

14  Plan Amendment, the City staff wrote: "The City Council finds the proposed

15  General Plan Amendment is in the public interest because by changing the

16  General Plan and subsequent zoning designations, the applicant can eliminate an

17  existing nonconformity in the City and redevelop the property in a manner that

18  conforms to the Zoning Ordinance.  The property is appropriate for a residential

19  designation because the area directly adjacent to the south property line is already

20  zoned for and designated Single Family Residential.  The site is more consistent

21  with the adjacent residential designation because the property access is located

22  off of Walnut St. and Appian Way, local streets, and the property does not have

23  visibility from Pacific Coast Highway.  These factors limit the utility and

24  suitability for commercial development on these parcels."  Attached as Exh. D.

25      62. In its proposed Ordinance to the City Council approving the zone

26  change from C-R to R-1, the City staff wrote:  "The City Council finds that the

27  proposed Zone Change NO. 110, changing the zoning from Commercial Retail to

28  R-1 Single Family Residential is consistent with the General Plan because this

19

1   property is not suitable for commercial development so it is consistent to rezone

2   it to an appropriate designation.  The property directly adjacent to the south is

3   already zoned for and designated Single Family Residential.  The site is more

4   consistent with the adjacent residential designation because the property access is

5   located off of Walnut St. and Appian Way, local streets and the property does not

6   have visibility from Pacific Coast Highway.  These factors limit the utility and

7   suitability for commercial development of these parcels." Attached as Exh. E.

8         63. In its proposed Ordinance to the City Council approving a zone text

9   amendment to allow "parking lots and parking buildings" as conditionally

10   permitted use in the C-R zone, the City staff wrote:  "The City Council finds that

11   a zone text amendment . . . to allow 'parking lots and parking buildings' as a

12   conditionally permitted use in the C-R (Commercial, Retail) Zone is consistent

13   with the General Plan because the C-R zone is established to provide for regional

14   retail uses and limited service uses in which parking is an accessory use.  Parking

15   lots and parking buildings are a permitted use within other commercial zones in

16   the City, such as the C-G Commercial General Zone which has the same General

17   Plan designation as the C-R zone.  Providing parking opportunities as a

18   conditionally permitted use within this zone is consistent with the intent of the

19   Zoning and General Plan designation, which is to encourage retail and service

20   uses and to manage development in a manner consistent with the historic

21   development trend of permitted parking lots in areas zoned for commercial uses.

22   In some areas of the City there are parking shortages, and allowing for parking

23   facilities may ease this burden for future development." Attached as Exh. F.

24         64. In its proposed Resolution to the City Council approving the zone

25   variance to allow ICSB a building height of 35 feet 6 inches instead of the code

26   allowed maximum height of 27 feet, the City staff wrote:  "The minaret proposed

27   for the religious facility is a unique architectural feature of the mosques

28   traditionally used to call people to prayer.  The proposed minaret is consistent in

1    terms of the height and mass with other religious facilities in Lomita.  Staff

2    reviewed three other facilities in the City located within Single Family

3    Residential zones and found they all exceeded the building height requirements.

4    The existing religious facility located at 25501 Eshelman has a maximum height

5    of 66 feet and was built in 1953.  The facilities located at 2120 255th Street and

6    24027 Pennsylvania, built in 1965 and 1966, also exceed building height

7    requirements with maximum heights of 40 feet and 47 feet, respectively.  ¶ A

8    variance to accommodate the architecture of the proposed religious facility is

9    reasonable and does not amount to a special privilege.  Not allowing the proposed

10   minaret would be an unnecessary hardship for this particular project." Attached

11   as Exh. G.

12        65. In its proposed Resolution to the City Council approving the Site Plan

13   Review to allow a side yard setback of 3' and a rear yard setback of 7' instead of

14   the code required 20', the City staff wrote:  "The site is suitable for the facility

15   and is so arranged to avoid traffic congestion and prevent adverse impacts on the

16   neighborhood with the modified yards adjacent to less sensitive commercial uses

17   and the 20' required side yard setback adjacent to the more sensitive residential

18   uses.  The design is suitable and functional because the site exceeds the lot width

19   and size requirements and the project is proposing a six foot perimeter block wall

20   and required landscaping.  The project is providing additional parking in excess

21   of the Code requirement and as determined by the traffic study and occupant load

22   projections. . . . Under normal circumstances there would only be a five foot

23   setback requirement.  In this particular case, the height of the architectural

24   minaret is increasing the setback requirement to 20'. . . . The project has the 20'

25   required side yard setback adjacent to the more sensitive residential uses and is

26   only requesting the modification adjacent to commercial uses.  The long, narrow,

27   and odd shape of the project site makes it impractical to require two- 20 foot side

28   yard set backs and creates an unnecessary hardship on the applicant.  The

1    modification is required to accommodate the architecture of the proposed

2    religious facility, which is reasonable and does not amount to special privilege,

3    and still maintains the privacy separation between structures." Attached as Exh.

4    H.

5          66. In its proposed Resolution to the City Council approving the

6    Conditional Use Permit to allow the religious facility to be built in the R-1 zone,

7    the City staff wrote: "The site is adequate in size and shape to accommodate the

8    various aspects of the project while integrating the use into the respective

9    commercial and residential portions of the neighborhood." Attached as Exh. I.

10   **The Small but Organized Opposition to ICSB's Proposed Renovation**

11         67. Subsequently, ICSB attempted to have its application heard by the

12   City Council in both October and November of 2009. Purportedly due to other

13   items on the agenda and city wide hearings, the City Council hearing of the

14   project was delayed to December 7, 2009.

15         68. On December 1, 2009, ICSB representatives met with City staff and

16   the City attorney who recommended that ICSB work further with the opposing

17   neighbors in order to assure a more positive outcome at the City Council hearing.

18   City representatives indicated that the timing of the application was not ideal as

19   opposition to the project was heavily organized because of the recent City

20   Council elections and that the City was receiving dozens of letters opposing the

21   project. Pursuant to the City's recommendation to work further with the

22   neighbors, ICSB representatives postponed the City Council hearing of their

23   application.

24         69. From December 2009 to March 2010, ICSB representatives organized

25   multiple meetings with neighbors. On January 24, 2010, ICSB sent invitations to

26   its immediate neighbors and those who had previously expressed opposition to its

27   project requesting individual meetings to gather input about the project. No

28   neighbors responded to the letter.

70. A second invitation was sent to the neighbors for a "Lunch and Learn" session on January 30, 2010 at the local Beijing Islamic restaurant. Only one individual, Mrs. Hamilton, responded to the invitation and reserved for three, but rescinded her reservation a few hours later. Significantly, a single individual, Bill Hoenig, showed up to the lunch and explained to ICSB representatives that the project was not the cause of opposition, but rather, the fear of population growth of Muslim families. Mr. Hoenig stated that he and others feared the Muslim population would grow from 1% to 30% in the City of Lomita.

71. In or around January 2010, the Methodist Church cancelled its parking arrangement with ICSB. The Methodist Church did not provide an explanation for its cancellation. On information and belief, the Church was heavily lobbied and pressured by the opposition to cancel the arrangement. The Methodist Church has since re-contracted with ICSB to allow its congregants to use the Church's parking lot during Friday (*jum'ah*) prayer.

72. On February 1, 2010, ICSB representatives received a letter from Defendant Henry Sanchez, who headed the opposition and subsequently became a sitting member of the City Council. Defendant Sanchez suggested that any future meetings be at a "neutral site" and that discussions of concerns not be done "individually or on personal level . . . but . . . on a group level."

73. On February 4, 2010, the South Coast Interfaith Council sent invitations to ICSB's neighbors for a moderated luncheon on February 10, 2010 to review the mitigation efforts undertaken by ICSB and to get feedback on ICSB's project. To ICSB and the South Coast Interfaith Council's disappointment, no neighbors showed up to the luncheon.

74. Pursuant to Mr. Sanchez's request to meet at a "neutral" location, ICSB's representatives worked with City staff to organize a meeting at City Hall on February 18, 2010. Approximately 25 neighbors attended the meeting, many expressing hostility towards the project. Mr. Sanchez acted as the spokesperson

1    of the opposition and commented that he and the other neighbors opposed ICSB's

2    project and would even see to it that ICSB's current services were discontinued.

3    The meeting ended abruptly when the individuals opposing the project walked

4    out.

5         75. Throughout this period, Mr. Sanchez continued to organize the

6    opposition.  He visited neighbors, including by inadvertence Muslim families,

7    and lobbied these individuals to oppose ICSB's project.  Flyers were created and

8    distributed to the neighbors, which included talking points and encouraged "a

9    large number of citizens to come to the CITY COUNCIL MEETING ON MON.,

10   MARCH 1 – our number shows our concern."  Flyers attached as Exh. J.

11        76. City representatives repeatedly informed ICSB representatives during

12   this period that the City was being inundated by letters and petitions from the

13   opposition lobbying the City Council to deny ICSB's application.  Despite this

14   vocal opposition, there were numerous other community members, including

15   neighboring religious institutions, businesses, and prominent members of the

16   local area who supported ICSB's application.

17        77. At multiple points during the application, Plaintiff and its

18   representatives inquired with the City Staff whether alternate rezoning measures

19   or zone text amendments could facilitate approval of the application.  City staff

20   responded that it was too late to adopt any of these measures as the application

21   had already been submitted, but also pointed out that some neighbors might be

22   concerned that such alternate measures would compromise the residential nature

23   of the neighborhood.

24        **The City Council Hearing and Denial of ICSB's Application**

25        78. On March 1, 2010, ICSB members presented the renovation and

26   consolidation plans to the City Council during a public hearing.  Mr. Sanchez

27   presented on behalf of the opposition.  Despite the Planning Commission and

28   City staff's recommendation for approval, City Councilmembers Blackwood,

1   Estrada, King and Mayor Suminaga immediately denied ICSB's application

2   without prejudice after nearly five hours of public comment both for and against

3   the project. Councilmember Gazeley recused himself from participating in the

4   vote since he was on the Planning Commission when the application was heard.

5         79. As noted in the Minutes to the hearing and the archived video of the

6   hearing, Councilmember Blackwood stated that he rejected the application

7   because he did not want to change any commercially zoned land to residential

8   use. Councilmember Estrada stated that she opposed amendments to the City's

9   general plan that would result from changing commercially-zoned land to

10  residential. Councilmember King, now deceased, spent a few minutes expressing

11  concern with the negative impact that the project would have on the parking and

12  traffic. Councilmember King especially emphasized his opposition to the

13  changing of the zone from commercial to residential stating, "We need to

14  conform with the zone change and general plan." Mayor Suminaga stated that

15  the project was "too dense" and expressed concern about the consequent traffic

16  on Walnut and Appian Way, despite the project's elimination of all foot traffic on

17  Appian Way. He additionally expressed fear that the renovated Islamic Center

18  would attract other congregants. He assured the Islamic Center that it had a right

19  to be there and that it could continue with its functions. None of the City Council

20  members cited to evidence supporting their concerns and discounted the studies

21  and mitigation efforts that ICSB undertook to address parking, traffic, and

22  building size.

23        80. In rejecting the proposal, the City Council did not explain why the

24  proposed mitigation efforts were ineffective, nor did the Council suggest specific

25  changes to the project to obtain City Council approval. The City Council has not

26  since provided ICSB any assurances that it could succeed in renovating and

27  consolidating its facilities subject to changes or revisions to its plan and

28  application. The denial of the plan became final on or about March 30, 2010.

81. On June 29, 2011, the United States Department of Justice opened an investigation of the City's denial of ICSB's application and possible violations of RLUIPA. At the time of the filing of this complaint, the investigation is ongoing.

82. On information and belief, the City of Lomita and several of the named defendants have approved similar land use entitlements, including the rezoning of commercial properties to low density residential, for non-Islamic institutional applications.

83.   On information and belief, the City of Lomita and several named defendants have suggested revisions or set conditions for approval of non - Islamic institutional applications, rather than deny the application, so as to reduce the number of nonconforming properties in the City of Lomita.

## FIRST CAUSE OF ACTION

### Permanent Injunction

### (Against Defendant City and Individual Defendants

### in their Official Capacity)

84. Plaintiff realleges and repleads all the allegations of the preceding paragraphs of this Complaint and incorporates them here by reference.

85. Defendant City's zoning ordinance, at the time of the application and denial and continuing thereafter, was unconstitutional and unlawful.

86. Through the LZO, the City barred the possibility of places of worship locating in its districts, either commercial or residential, without first obtaining a CUP and then becoming subject to additional conditions.  Indeed, places of worship were and continue to be completely excluded from commercial retail zones.  Such restrictions were not imposed on properties used for non-religious purposes like private clubs.

87. The denial of Plaintiff's application for a General Plan Amendment, Zone Change, Zone Text Amendment, Conditional Use Permit, Site Plan Review, and Zone Variance violates Plaintiff's right to free exercise of religion, freedom

of speech, freedom of assembly, and equal protection of the laws, and as such violates the First and Fourteenth Amendments to the United States Constitution and California Constitution, Article I. The denial also violates the RLUIPA, 42 U.S.C. §2000cc, *et seq.*

88. An actual controversy and dispute exists between the parties, which requires the Court to decide the issues presented. Plaintiff has exhausted all of its legislative and administrative remedies. There is no plain, adequate, or speedy remedy at law.

89. Unless enjoined and restrained by this Court, Plaintiff's rights to free speech, freedom of assembly, free exercise of religion, and equal protection will continue to be violated. Plaintiff has also suffered monetary loss and damages as a result of Defendants' unconstitutional actions.

90. All of the acts of Defendant City, its officers, agents, servants and employees, as here alleged, were conducted under the cover and pretense of the statutes, policies, regulations, customs, and usages of Defendant City.

91. Unless Defendants are enjoined and restrained from implementing the LZO in a manner that imposes a substantial burden on the religious exercise of ICSB, Plaintiff will continue to suffer irreparable injury. Similarly, unless Defendants are enjoined and restrained from enforcing the discriminatory LZO against Plaintiff, or alternatively, if they are not enjoined and restrained from enforcing the LZO in a discriminatory manner, Plaintiff will continue to suffer irreparable injury.

92. Plaintiff prays for relief against Defendants as set forth in the prayer below.

///
///
///
///

1

## SECOND CAUSE OF ACTION

### Violation of the Religious Land Use and Institutionalized Persons Act

### Substantial Burden on Religious Exercise

### (42 U.S.C. § 2000cc et seq.)

### (Against all Defendants in their Individual and Official Capacities)

93. Plaintiff realleges and repleads all the allegations of the preceding paragraphs of this Complaint and incorporates them here by reference.

94. Defendants have deprived and continue to deprive Plaintiff its right to the free exercise of religion, as guaranteed under the RLUIPA, by imposing and implementing a land use regulation that places a substantial burden on Plaintiff's religious exercise.

95. Defendant City has in place formal and informal procedures and practices that permit Defendants, and each of them, to make individualized assessments of the proposed religious use of the Subject Property.  Defendant City further makes and has in place one or more land use regulations which direct that no property within the jurisdiction of the City may be used as a religious facility without prior issuance of a CUP.

96. Defendants have imposed and implemented, and threaten to continue to impose and implement, land use regulations in a manner that imposes a substantial burden on Plaintiff's religious exercise.

97. Defendants' actions are not in furtherance of any compelling governmental interest, nor are they the least restrictive means of furthering any particular governmental interest.  As such, Defendants' actions violate 42 U.S.C. §§ 2000cc(a).

98. As a proximate result of Defendants' actions, Plaintiff has been damaged and continues to be damaged in an amount to be determined at trial for the costs incurred in applying for, among other things, a General Plan Amendment, Zone Change, Zone Text Amendment, Conditional Use Permit, Site

Plan Review, and Zone Variances and other costs presently unknown, but which are within the jurisdictional limits of this Court. Plaintiff is entitled to an order from this Court authorizing ICSB to proceed with the building of its religious facility and engage in the free exercise of its congregants' religion.

99. Plaintiff has incurred substantial attorneys' fees and expenses and request that they be awarded such fees and expenses under 42 U.S.C. § 1988(b) and other applicable statutes.

## THIRD CAUSE OF ACTION

### Violation of the Religious Land Use and Institutionalized Persons Act

### Discrimination on the Basis of Religion

### (42 U.S.C. § 2000cc et seq.)

### (Against all Defendants in Their Individual and Official Capacities)

100. Plaintiff realleges and repleads all the allegations of the preceding paragraphs of this Complaint and incorporates them here by reference.

101. Defendants have deprived and continue to deprive Plaintiff of its right to be free from religious discrimination, as guaranteed under the RLUIPA, by imposing and implementing a land use regulation that discriminates against it on the basis of religion.

102. Defendants, by denying Plaintiff's application while having approved similar applications, have discriminated against Plaintiff on the basis of religion.

103. Defendant City has enacted the LZO, which constitutes a land use regulation. The LZO, at the time of Plaintiff's application and denial, facially discriminated on the basis of religion or religious denomination and, as applied by Defendants, discriminated against Plaintiff in violation of 42 U.S.C. §§2000cc2(b)(2). Defendants' denial of Plaintiff's application for a General Plan Amendment, Zone Change, Zone Text Amendment, Conditional Use Permit, Site Plan Review, and Zone Variances violates 42 U.S.C. §§2000cc2(b)(2).

**FOURTH CAUSE OF ACTION**

**Violation of the Religious Land Use and Institutionalized Persons Act**

**Equal Terms**

**(42 U.S.C. § 2000cc et seq.)**

**(Against all Defendants in Their Individual and Official Capacities)**

104. Plaintiff realleges and repleads all the allegations of the preceding paragraphs of this Complaint and incorporates them here by reference.

105. Defendants have deprived and continue to deprive Plaintiff of its right to be free from religious discrimination, as guaranteed under the RLUIPA, by treating them on less than equal terms as a nonreligious assembly or institution.

106. Defendant City enacted the LZO, which constitutes a land use regulation.  The LZO, at the time of Plaintiff's application and denial, facially treated a religious assembly or institution on less than equal terms with a nonreligious assembly or institution in violation of 42 U.S.C. §§2000cc2(b)(1). Defendants' denial of Plaintiff's application for a General Plan Amendment, Zone Change, Zone Text Amendment, Conditional Use Permit, Site Plan Review, and Zone Variances violates 42 U.S.C. §§ 2000cc2(b)(1).

**FIFTH CAUSE OF ACTION**

**Violation of the Religious Land Use and Institutionalized Persons Act**

**Unreasonable Limitation**

**(42 U.S.C. § 2000cc et seq.)**

**(Against all Defendants in Their Individual and Official Capacities)**

107. Plaintiff realleges and repleads all the allegations of the preceding paragraphs in this Complaint and incorporates them here by reference.

108. Defendants have deprived and continue to deprive Plaintiff of its right to the free exercise of religion, as guaranteed under the RLUIPA, by imposing and implementing a land use regulation that unreasonably limits

30

1  religious assemblies within a jurisdiction.

2      109. Defendant City has enacted the LZO, which constitutes a land use

3  regulation.  The LZO, at the time of Plaintiff's application and denial, facially

4  discriminates against religious assemblies or unreasonably limits religious

5  assemblies, institutions, or structures within its jurisdiction in violation of 42

6  U.S.C. §§2000cc2(b)(3).  Defendants' denial of Plaintiff's application for a

7  General Plan Amendment, Zone Change, Zone Text Amendment, Conditional

8  Use Permit, Site Plan Review, and Zone Variances violates 42 U.S.C.

9  §§2000cc2(b)(3).

10                    **SIXTH CAUSE OF ACTION**

11              **Violation of the United States Constitution**

12    **Free Speech; Free Exercise of Religion; Freedom of Assembly**

13                **First and Fourteenth Amendments**

14                      **(42 U.S.C. § 1983)**

15    **(Against all Defendants in Their Individual and Official Capacities)**

16      110. Plaintiff realleges and repleads all the allegations of the preceding

17  paragraphs of this Complaint and incorporates them here by reference.

18      111. Defendants, acting under color of state law and through their

19  policies, practices and customs, have deprived and continue to deprive Plaintiff

20  of its right to speak on matters of religion, its free exercise of religion, and its

21  right to freely assemble for the purposes of worship, as guaranteed in the First

22  Amendment to the United States Constitution and made applicable to the States

23  through the Fourteenth Amendment, by discriminating against Plaintiff based on

24  the religious viewpoint of its expression, by inhibiting its right to freely express

25  its faith to its congregants and to the community, and by discriminatorily

26  applying vague statutes, ordinances and regulations against it.

27      112. The conduct complained of herein was undertaken pursuant to the

28  policies, practices or customs of Defendant City, and was manifested by the

1    decision officially adopted and promulgated by individual Defendants.

2        113. The LZO and Defendant City's land use and zoning policies, at the

3    time of Plaintiff's application and denial and continuing thereafter, are not neutral

4    and of general application and both on their face and as applied to Plaintiff,

5    abridge Plaintiff's rights to freedom of speech, religion and assembly because

6    they discriminate among speech, religion, assembly, and other expressive activity

7    on the basis of its content. The LZO and Defendant City's land use and zoning

8    policies imposes restrictions on speech of religious content while speech of non-

9    religious content, even if expressed in the same time, place and manner, is not

10   proscribed or regulated. Additionally the LZO and Defendant City's land use

11   and zoning policies discriminated between religious and nonreligious assemblies.

12       114. Defendants lack either a compelling or substantial legitimate

13   governmental interest in regulating speech and expression in the manner

14   accomplished by the LZO.

15       115. The LZO is not sufficiently narrowly tailored to serve any

16   appropriate governmental interest.

17       116. The LZO and Defendant City's land use and zoning policies, both on

18   their face and as applied to Plaintiff, abridge Plaintiff's rights to free speech

19   because they are substantially under-inclusive in that they improperly treat

20   religious speech disparately.

21       117. The LZO and Defendant City's land use and zoning policies, at the

22   time of Plaintiff's application and denial and continuing thereafter, both on their

23   face and as applied to Plaintiff, abridged Plaintiff's rights to free speech because

24   they constitute a license tax on the right to preach religious teachings.

25       118. As a result of Defendants' unconstitutional policies and practices,

26   Plaintiff has been damaged in an amount subject to proof at trial.

27       119. Individual defendants' conduct was with malice, fraud, and

28   oppression, and thus individual defendants are also liable for punitive damages

for their acts.

### SEVENTH CAUSE OF ACTION

**Violation of the United States Constitution**

**Equal Protection:  Fourteenth Amendment**

**(42 U.S.C. § 1983)**

**(Against all Defendants)**

120. Plaintiff realleges and repleads all the allegations of the preceding paragraphs of this Complaint and incorporates them here by reference.

121. Defendants, acting under color of state law and through their policies, practices and customs, have deprived and continue to deprive Plaintiff of its right to equal protection of the laws, as guaranteed under the Fourteenth Amendment to the United States Constitution, by discriminating against Plaintiff in its application of the laws of the State of California and the Lomita Municipal Code.

122. The LZO and Defendant City's land use and zoning policies at the time of Plaintiff's application and denial amounted to discriminatory treatment of religious institutions and an unreasonable restriction on the acquisition of property and/or buildings.

123. The conduct complained of herein was undertaken pursuant to the policies, practices or customs of Defendant City, and was manifested by the decision officially adopted and promulgated by individual Defendants.

124. Individual defendants' conduct was with malice, fraud, and oppression, and thus individual Defendants sued in their individual capacity are also liable for punitive damages for their acts.

///

///

///

///

**EIGHTH CAUSE OF ACTION**

**Violation of the California Constitution Art. I § 2**

**Liberty Speech Clause**

**(Against all Defendants)**

125. Plaintiff realleges and repleads all the allegations of the preceding paragraphs of this Complaint and incorporates them here by reference.

126. Defendants, acting under color of state law, have deprived and continue to deprive Plaintiff of its right to speak on matters of religion, as guaranteed under Article I, Section 2 of the California Constitution, by discriminating against Plaintiff based on the religious viewpoint of its expression, by inhibiting its right to freely express its faith to its congregants and to the community, and by applying vague statutes, ordinances, and regulations against it.

127. Individual defendants' conduct was with malice, fraud, and oppression, and thus individual Defendants sued in their individual capacity are also liable for punitive damages for their acts.

**NINTH CAUSE OF ACTION**

**Violation of the California Constitution, Art. I § 3**

**Freedom of Assembly**

**(Against all Defendants)**

128. Plaintiff realleges and repleads all the allegations of the preceding paragraphs of this Complaint and incorporates them here by reference.

129. Defendants, acting under color of state law, have deprived Plaintiff of its right to freely assemble for the purpose of worship, as guaranteed under Article I, Section 3 of the California Constitution, by inhibiting Plaintiff's ability to assemble and worship in a location where similar, but nonreligious, groups would be permitted to assemble and by placing a substantial burden on Plaintiff's right to freely assemble without compelling justification.

# TENTH CAUSE OF ACTION

## Violation of the California Constitution Art. I, § 4

## Religious Liberty

## (Against all Defendants)

130. Plaintiff realleges and repleads all the allegations of the preceding paragraphs of this Complaint and incorporates them here by reference.

131. Defendants have deprived and continue to deprive Plaintiff of its right to free exercise and enjoyment of religion, as guaranteed under Article I, Section 4 of the California Constitution, by discriminating against Plaintiff because of its religious character and by inhibiting its right to freely exercise its religious faith, and placing a substantial burden upon Plaintiff without compelling justification.

# ELEVENTH CAUSE OF ACTION

## Violation of the California Constitution Art. I, § 7

## Equal Protection

## (Against all Defendants)

132. Plaintiff realleges and repleads all the allegations of the preceding paragraphs of this Complaint and incorporates them here by reference.

133. Defendants, acting under color of state law, have deprived and continue to deprive Plaintiff of its right to equal protection of the laws, as guaranteed under Article I, Section 7 of the California Constitution, by discriminating against Plaintiff in its application of the laws of the State of California and Lomita Municipal Code.

# TWELFTH CAUSE OF ACTION

## Declaratory Relief

## (Against Defendant City and Official Capacity Defendants)

134. Plaintiff realleges and repleads all the allegations of the preceding paragraphs of this Complaint and incorporates them here by reference.

135. The LZO and Defendant City's zoning ordinance and laws, at the time of Plaintiff's application and denial and continuing thereafter, were invalid and unenforceable, both on their face and as construed by Defendants, in that they violate the RLUIPA and the United States and California Constitutions.

136. An actual controversy exists between Plaintiff and Defendants regarding Plaintiff's rights under the LZO.  Such a declaration is necessary and appropriate.  Plaintiff desires a declaration as to the validity of the LZO, both on its face and as applied to Plaintiff's activities, and if it is found to have been valid, whether Defendants applied the LZO in either a substantially burdensome or discriminatory manner.

137. A judicial declaration is necessary and appropriate at this time so that Plaintiff may ascertain its rights and duties in the Subject Property.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff respectfully requests this Court grant the following relief:

A. A permanent injunction restraining Defendants, their officers, agents, employees, and attorneys from enforcing or endeavoring to enforce the LZO to prohibit Plaintiff from renovating and consolidating its Islamic Center;

B. A declaration that the application of the LZO so as to exclude Plaintiff from developing the Subject Property for religious purposes, was void, invalid and unconstitutional as violating the Free Exercise and Free Speech protections of the United States and California Constitutions; the right to assemble freely as protected by the United States and California Constitutions; the right to Equal Protection as protected by the United States and California Constitutions; and Plaintiff's rights under the RLUIPA.

C. General damages according to proof;

D. Special damages according to proof;

1      E. Punitive damages against Defendants sued in their individual capacity

2  according to proof;

3      F. For the costs of suit incurred herein;

4      G. For an award of interest, including pre-judgment interest, at a legal rate;

5      H. For an award of reasonable attorney fees to counsel for Plaintiff; and

6      I. For other equitable or legal relief that the Court considers just and proper.

7

8  Dated: March 20, 2012                    Respectfully Submitted,

9                                           HADSELL STORMER KEENY

10                                          RICHARDSON & RENICK, LLP

11                                          COUNCIL ON AMERICAN-ISLAMIC

12                                          RELATIONS, CALIFORNIA

13

14                                          By: _Alee Rele_____

15                                              Anne Richardson

16                                              Attorneys for Plaintiff
                                                ISLAMIC CENTER OF THE
17                                              SOUTH BAY, LOS ANGELES

18

19

20

21

22

23

24

25

26

27

28

Complaint

Exh. A

ORDINANCE NO.

AN ORDINANCE OF THE CITY COUNCIL OF THE CITY OF LOMITA, CALIFORNIA, APPROVING ZONE TEXT AMENDMENT NO. 2011-05 APPROVING AMENDMENTS TO THE LOMITA MUNICIPAL CODE TO AMEND THE NOMENCLATURE FOR RELIGIOUS AND ASSEMBLY USES AND TO STANDARDIZE DEVELOPMENT CRITERIA FOR ASSEMBLY USES IN ALL ZONES AND TO CORRECT AN INCORRECT CITATION. INITIATED BY THE CITY OF LOMITA.

THE CITY COUNCIL OF THE CITY OF LOMITA, CALIFORNIA, DOES ORDAIN AS FOLLOWS:

<u>Section 1. Recitals</u>

A. On January 3, 2011 the City Council of the City of Lomita held a duly noticed public hearing on the draft ordinance.

B. On December 12, 2011, the Planning Commission held a duly noticed public hearing on Zone Text Amendment No. 2011-05, accepted public testimony, and recommended City Council approval of the proposed ordinance.

C. In accordance with the California Environmental Quality Act, the adoption of this ordinance is exempt from CEQA pursuant to Sections 15061(b)(3) of the CEQA Guidelines because the ordinance clarifies and revises antiquated code provisions by changing the nomenclature for religious and assembly uses and standardizing existing development criteria to conditionally permitted assembly uses that operate in the same manner. Eliminating lot area, frontage, and setback criteria for churches will not create significant environmental impacts because the existing on-site parking requirements, generally applicable development standards for the zoning districts and the conditional use permit criteria will ensure that the size of the lot is adequate to support any proposed assembly use in a manner that is consistent with neighboring uses.

<u>Section 2.</u>

<u>Part 1.</u> Section 4-1.03 of Title IV of the Lomita Municipal Code is amended by replacing the term "church" with "religious facility (as defined in Title XI)."

<u>Part 2.</u> Subsections 6-2.24(a) and (b) of Title VI of the Lomita Municipal Code are amended by replacing the word "church" with "religious facility (as defined in Title XI)."

<u>Part 3.</u> Subsection 6-4.16(a)(2) of Title VI of the Lomita Municipal Code is amended by replacing the word "churches" with "religious facilities (as defined in Title XI)."

<u>Part 4.</u> Section 11-1.15.01(A) of Title XI of the Lomita Municipal Code is amended by adding a new definition for "Assembly Hall" to the alphabetical list of definitions to read as follows:

"Assembly Hall" shall mean any building, or portion of a building, used for public or private gatherings, with a maximum capacity for congregation in the assembly area of more than fifty

Ordinance No.
Page 2

people (as determined the Department of Building and Safety). For example, and without limitation, assembly hall includes a club, lodge, meeting hall, religious facility, auditorium, theater and similar kinds of facilities used for congregation purposes, whether available for public or private use. Unless otherwise specified in this Code, any use with an assembly area of more than fifty people shall be classified as an assembly use for purposes of applying the standards in this code. Uses that accommodate less than fifty people in the assembly area shall be classified according to their respective primary activities.

Part 5. Section 11-1.15.18(R) of Title XI of the Lomita Municipal Code is amended by adding a new definition for "Religious Facility" to the alphabetical list of definitions to read as follows:

"Religious Facility" shall mean a facility operated by religious organizations for worship, or the promotion of religious activities with a maximum capacity for congregation in the assembly area of more than fifty people (as determined the Department of Building and Safety). Religious facility includes without limitation a church, mosque, synagogue, temple, or similar places for religious worship. Accessory uses on the same site associated with a religious facility are permitted (such as living quarters for clergy and staff and religious school and child day care facility), provided that the accessory use: (1) is customarily a part of, and clearly incidental and secondary to, the place of worship; (2) does not change the character of the religious facility; and (3) the use is authorized by the same type of land use permit required for the religious facility itself. Non-accessory uses, including without limitation full-time educational institutions, hospitals and other potentially related operations (for example, a recreational camp) are classified according to their respective primary activities.

Part 6. The table of permitted uses in Section 11-1.30.01 of Title XI of the Lomita Municipal Code is amended by replacing the term "Churches" with "Religious Facilities," alphabetizing the ensuing permitted uses accordingly, and amending the requirements for "Schools" to read as follows:

| Use | Zone | | | Supplemental Requirements |
|-----|------|------|------|-----------------------------|
| | A-1 | R-1 | RVD | |
| Schools (2) | C | C | C | Unless otherwise exempted by the school district, schools with a total capacity of more than fifty students (as determined by the Department of Building and Safety) shall be subject to the development standards in Section 11-1.68.04 |

Part 7. Subsection 11-1.41.02(7) of Title XI of the Lomita Municipal Code is repealed from the list of permitted uses.

Part 8. Section 11-1.41.05 of Title XI of the Lomita Municipal Code is amended to read as follows:

Ordinance No.
Page 3

Sec. 11-1.41.05. - Uses by conditional use permits.

Premises in Zone C-S-P may be used for the following purposes, provided a conditional use permit has first been obtained, pursuant to the provisions of Article 70 of the Lomita Zoning Code:

(1) Assembly Halls, subject to the provisions of Section 11-1.68.04
(2) Buildings exceeding thirty-five (35) feet in height.
(3) Electric distribution substations including microwave facilities incorporated as a part of a public utility installation.
(4) Hospitals.
(5) Mortuaries.
(6) Restaurants and cafes serving alcoholic beverages, pursuant to Article 56 of the Lomita Zoning Code.
(7) Schools, and unless otherwise exempted by the school district, schools with a total school capacity of more than  fifty students (as determined the Department of Building and Safety) shall be subject to the development standards in Section 11-1.68.04

Part 9. Section 11-1.42.05 in Title XI of the Lomita Municipal Code is amended by deleting the term "Churches" from the alphabetical list of conditionally permitted uses and renumbering the ensuing land uses accordingly, and deleting the reference to "Article 72 (Variances and Conditional Use Permits)" and replacing it with "Article 70 (Zoning Ordinance Administration)."

Part 10. Section 11-1.45.02 in Title XI of the Lomita Municipal Code is amended by deleting subsections (13) and (28) from the alphabetical list of uses and renumbering the ensuing land uses accordingly.

Part 11. Section 11-1.45.05 in Title XI of the Lomita Municipal Code is amended by (1) deleting the terms "Churches" and "Lodge Halls" from the alphabetical list of conditionally permitted uses; (2) adding "Gymnasiums (with a capacity of more than 50 people)" and "Theaters (with a capacity of more than 50 people)" to the alphabetical list of conditionally permitted uses; (3) renumbering the ensuing land uses accordingly; and (4) deleting the reference to "Article 72 (Variances and Conditional Use Permits)" and replacing it with "Article 70 (Zoning Ordinance Administration)."

Part 12. Section 11-1.48.03 in Title XI of the Lomita Municipal Code is amended by deleting "Theaters, movie" from the alphabetical list of uses, and renumbering the ensuing land uses accordingly.

Part 13.  Section 11-1.48.04 in Title XI of the Lomita Municipal Code is amended by: (1) deleting the term "Private Clubs" from the alphabetical list of conditionally permitted uses; (2) adding the term "Theaters, movie (not covered under 11-1.48.02(B))" to the alphabetical list of conditionally permitted uses; (3) renumbering the ensuing land uses accordingly; and (4) deleting the reference to "Article 72 (Variances and Conditional Use Permits)" and replacing it with "Article 70 (Zoning Ordinance Administration)."

Ordinance No.
Page 4

Part 14.  Subsection (40) of Section 11-1.49.02 in Title XI of the Lomita Municipal Code is repealed.

Part 15.  Section 11-1.49.04(A) in Title XI of the Lomita Municipal Code is amended by adding "Theaters, live stage and movie" to the alphabetical list if conditionally permitted uses and renumbering the ensuing land uses accordingly.

Part 16.  Subsection (8) of Section 11-1.49.05 in Title XI of the Lomita Municipal Code is amended to read as follows:

(8) Institutional uses (including schools and assembly halls).

Part 17. Section 11-1.51.05 of Title XI of the Lomita Municipal Code is amended by deleting the terms "Clubs, private" and "Lodge halls" from the alphabetical list of conditionally permitted uses, adding "Assembly Halls, subject to the provisions of Section 11-1.68.04" to the alphabetical list of conditionally permitted uses, and renumbering the ensuing land uses accordingly.

Part 18.  A new Section 11-1.60.05 is added to Title XI of the Lomita Municipal Code to read as follows:

11-1.60.05 Equal Terms

The City intends to regulate on equal terms all similar land uses that generate the same potential impacts.  The development standards in this Chapter shall be interpreted and applied in a manner consistent with this intent.

Part 19.  The list of land uses that are subject to the parking requirements for "Places for public assembly" in the table in Section 11-1.66.03 of Title XI of the Lomita Municipal Code is amended to read as follows:

Auditoriums, assembly halls, cultural centers, dance and fitness studios, health clubs and other similar uses

Part 20.  Section 11-1.67.02(15) of Title XI of the Lomita Municipal Code is amended by replacing the word "church" with "religious facility."

Part 21.  Section -1.67.03(f)(1) of Title XI of the Lomita Municipal Code is amended by replacing the phrase "church or temple" with "assembly hall."

Part 22. Section 11-1.68.04 of Title XI of the Lomita Municipal Code is amended to read as follows:

11-1.68.04. – Assembly Halls

In all zones where assembly halls are permitted, the following development standards are required for new assembly halls:

Ordinance No.
Page 5

    (1) Parking Lot Facilities:
        (a) Landscaping for parking lots for new assembly halls shall be provided as required in article 66.
        (b) A six-foot high perimeter masonry wall shall be required adjacent to residential uses. Walls adjacent to commercial or industrial uses shall be required at the discretion of the planning commission.
    (2) Religious facilities legally existing on Jan. 7, 1991 shall not be declared nonconforming with reference to standards contained in this section. Additions to such religious facilities may be approved by the planning commission.

Part 23. The definition of "Institutional and public land uses" in the alphabetical list of definitions in Section 11-1.69.01 in Title XI of the Lomita Municipal Code is amended to replace the term "church" with "religious facility."

Section 3. The City Council finds that the proposed ordinance is consistent with the General Plan because it regulates uses in order to promote compatibility and maintain neighborhood character. The ordinance standardizes the development criteria applicable all assembly uses to better achieve the intent of existing regulations for assembly-type uses. All assembly uses with congregation areas that can accommodate more than 50 people are treated the same, whether it be a private club, lodge, theater, gymnasium, or similar type use, and must receive a CUP. To the extent the provisions of this ordinance are substantially the same as previous provisions of the Lomita Municipal Code, these provisions shall be construed as continuations of those provisions and not as new enactments.

Section 4. If any part of this Ordinance or its application is deemed invalid by a court of competent jurisdiction, the City Council intends that such invalidity will not affect the effectiveness of the remaining provisions or applications and, to this end, the provisions of this Ordinance are severable.

Section 5. This ordinance shall take effect thirty (30) days after the date of its passage.

Section 6. The City Clerk shall certify to the passage of this ordinance and shall cause the same to be published as required by law.

PASSED, APPROVED AND ADOPTED this _____ day of _____ 2012.

                                        _____
                                        MAYOR

ATTEST:


_____
CITY CLERK

Complaint

# Exh. B



# CITY OF LOMITA
# PLANNING COMMISSION REPORT

**TO:**        Planning Commission                                    September 14, 2009

**FROM:**      Alicia Heideman, Associate City Planner

**SUBJECT:**   General Plan Amendment No. 2008-03, Zone Change No. 110, Zone Text
               Amendment No. 2008-07, Conditional Use Permit No. 263, Site Plan Review No.
               1120, and Zone Variance No. 216.
               25816 Walnut Street, 25829 -1/4, 25833, 25833-1/2 Appian Way, and APN No.
               7553-010-032.

## PROJECT DESCRIPTION

A new religious facility at 25816 Walnut Street, 25829 -1/4, 25833, and 25833-1/2 Appian Way
is being proposed.  The facility requires General Plan Amendment No. 2008-03, Zone Change
No. 110, Zone Text Amendment No. 2008-07, Conditional Use Permit No. 263, Site Plan
Review No. 1120, and Zone Variance No. 216 as follows:

1. An amendment to the City of Lomita General Plan Land Use Map from Commercial to
   Low Density Residential;
2. An amendment to the City's Zoning Map from C-R, Commercial Retail, to R-1, Single
   Family Residential for the properties located at 25816 Walnut Street and 25829 ¼
   Appian Way;
3. A request for a zone text amendment amending Section 11-1.48.02 of the Lomita Zoning
   Code to allow "parking lots and parking buildings" as a conditionally permitted use in the
   C-R (Commercial, Retail) Zone;
4. A conditional use permit to allow a 14,320 square foot religious facility and a 1,470
   square foot priest/caretakers unit within the R-1, Single Family Residential Zone, and a
   stand alone parking lot within the CR, Commercial Retail Zone;
5. A site plan review and modification to permit a side yard setback of 3' instead of the
   code required 20' and to permit a rear yard setback of 7' instead of the code required 20
   feet; and
6. A request for a variance from Section 11-1.32.06(D)(1) of the Zoning Ordinance to allow
   building height of 35 feet, 6 inches instead of the code allowed maximum height of 27'
   for the properties at 25816 Walnut Street, 25829 -1/4, 25833, 25833-1/2 Appian Way,
   and APN No. 7553-010-032.

The project was initiated and filed by Shakil Patel of 25982 Hinkley St. Loma Linda, CA 92354.

## RECOMMENDATION

Staff recommends that the Planning Commission recommend City Council approval of General
Plan Amendment No. 2008-03, Zone Change No. 110, and Zone Text Amendment No. 2008-07.

*Planning Commission: September 14, 2009*
*GPA No. 2008-03, ZC No. 110, ZTA No. 2008-07, CUP No. 263, SP No. 1120 & ZV No. 216*
*Page 2 of 9*

If the Planning Commission recommends approval of the legislative amendments, staff also recommends that the Planning Commission consider and recommend City Council approval of Conditional Use Permit No. 263, Site Plan Review No. 1120, and Zone Variance No. 216.

**BACKGROUND**
At the June 8th Planning Commission meeting this item was tabled over concerns about parking, building size, and traffic. The minutes, as well as the June 8th staff report, are attached to this report for reference. After a considerable amount of public testimony both for and against the project, the Commission directed the applicant and staff to work with the surrounding neighborhood to address their concerns regarding those issues. In response to the meeting the following changes to the project were made:

| Changes | Zoning Requirement | Current Proposal | Previous Submittal |
|---|---|---|---|
| Total Square Feet | NA | 15,790 sq. ft. | 16,851 sq. ft. |
| Main Structure Square Feet | NA | 14,320 sq. ft. | 16,851 sq. ft. |
| Minaret Height | 27 feet | 35'6" | 40'7" |
| Rear Yard Setback | 20 feet | 7'-15' | 40 feet |
| North Side Yard Setback | 20 feet | 3 feet | 10 feet |
| South Side Yard Setback | 20 feet | 20 feet | 12 feet |
| Parking Spaces | 49 | 65 | 74 |

Furthermore, staff assisted the applicant by holding two community meetings at City Hall that were open to residents of the neighborhood. The meetings were held on July 1st, where approximately 15 people attended, and August 12th, where approximately 26 people attended. Both meetings were noticed to the surrounding residents within 300 feet of the project site. At those meetings the residents requested that the applicant negotiate with the Methodist Church on 259th Street to use their lot for additional parking, reduce the height of the minaret to 35 feet and erect a silhouette structure as a visual aid, add additional landscaping on the south/east areas of the property, and eliminate all foot traffic from Appian Way.

In response to these requests the applicant eliminated all foot traffic from Appian Way, negotiated a renewable one-year lease for Friday afternoons for the parking area on 259th owned by the Methodist Church, added additional landscaping to the project site, reduced the height and built a silhouette structure of the minaret.

**ANALYSIS**
**LEGISLATIVE APPROVALS**

General Plan Designation/Amendment
The General Plan designation for the subject property is part "Commercial" and part "Low Density Residential." Exhibits C and D to this report map the subject property and delineate the parcels proposed for amendments. The Commercial land use designation applies to the commercial corridors in Lomita including those located along Pacific Coast Highway, Lomita Boulevard, Western Avenue and the northern end of Narbonne Avenue. The Residential land use designation applies to areas of the City which are developed predominantly with single family

residential uses. The applicant is proposing a General Plan amendment to change the commercial portion of the site to Low Density Residential.

Religious Facilities are not permitted in the CR, Commercial Retail zone, although the current use of the property is a legal nonconforming religious facility in the CR Zone. The applicant is proposing a Zone Change for the site to R-1 (see below) where religious facilities are conditionally permitted; however, the zoning designation for the property must be consistent with the General Plan designation, requiring that the General Plan be also changed from commercial to residential. By changing the General Plan and subsequent zoning designations, the applicant can move forward with proposing the new center and eliminate an existing nonconformity in the City.

Zone Change
The project is proposing a Zone Change for two parcels changing the zoning from Commercial Retail to R-1 Single Family Residential. Although the religious facility currently exists at the location, this use is not permitted in the Commercial Retail zone; therefore both the Zoning (and the General Plan designation) must be changed prior to allowing the construction of a new facility.

| Address | Current GP/ Zoning Designation | Proposed GP/ Zoning Designation |
|---|---|---|
| 25816 Walnut Street | Commercial/C-R | Low Density Residential/R-1 |
| 25829 ¼ Appian Way | Commercial/C-R | Low Density Residential/R-1 |

Directly adjacent to the south property line the area is already zoned for and designated Single Family Residential. Since the properties are contiguous with other R-1 zoned property, expanding the existing zone should not create a "spot zoning" situation.  Furthermore, the site is more consistent with a residential designation because the property access is located off of Walnut St. and Appian Way, local streets, and the property does not have visibility from Pacific Coast Highway. These factors limit the utility and suitability for commercial development on these parcels.

Zone Text Amendment
The applicant is also proposing to allow "parking lots and parking buildings" as a conditionally permitted use within the C-R, Commercial Retail zone. The C-R zone is established to provide for regional retail uses and limited service uses. Some of the principal uses permitted in the C-R zone include most retail uses, restaurants, limited personal services, and financial services. Parking lots and parking buildings are a permitted use within the C-G Commercial General Zone, and staff finds that it is also consistent with the intent of the Commercial Retail zone. In some areas of the City there are parking shortages, and allowing for parking facilities could help to ease this burden for future development. Furthermore, since parking lots and buildings will be a conditionally permitted use, every proposed parking facility will be reviewed by the Planning Commission for compatibility with the area prior to granting a CUP.

*Planning Commission: September 14, 2009*
*GPA No. 2008-03, ZC No. 110, ZTA No. 2008-07, CUP No. 263, SP No. 1120 & ZV No. 216*
*Page 4 of 9*

Council Recommendations

The applicant has proposed a comprehensive set of applications for the redevelopment of the property with a religious facility. In order to achieve the applicant's goal, the above legislative changes, General Plan amendment, a zoning map amendment and a zone text amendment, are required in addition to administrative permits. If these three legislative proposals were accepted and approved by the City Council, the applicant would then require a Site Plan review, Variance, and a Conditional Use Permit to apply the legislative changes to the proposed development.

The Planning Commission makes recommendations to the City Council with respect to the legislative proposals. The Planning Commission cannot approve any administrative applications that are not consistent with the Zoning Ordinance and General Plan as those documents currently exist. Because the applications for the Site Plan Review, Variance and CUP are dependent on enactment of the proposed legislative changes, the Planning Commission will make a recommendation to the City Council with respect to these administrative applications, consistent with its recommendation on the legislative applications, and the City Council will consider the Planning Commission's recommendations and the applications for the entire project all together.

If the Planning Commission does not recommend that the City Council approve the legislative proposals, it is not necessary to consider further the administrative applications because the administrative applications are only consistent with the General Plan and the zoning ordinance if it is amended in the manner proposed by the applicant. Should the Planning Commission recommend that the City Council approve the legislative proposals, the Planning Commission should also make a recommendation with respect to the administrative applications, including any appropriate conditions, should the Council enact the legislative changes proposed by the applicant. What follows is a discussion of the administrative approvals for consideration by the Planning Commission if the Commission recommends approval of the legislative amendments.

**ADMINISTRATIVE APPROVALS**

Notable changes made to the site plan are the reduction of the overall size of the structure and the removal of the caretaker/priest residence from inside the proposed Center to a small residential unit fronting on Appian Way. Also, by removing the caretaker's residence the applicant has further reduced the size of the building and increased the setback on the second story an additional 12 feet, leaving a 20 foot setback for the first floor and a 32 foot setback for the second floor on the south side. The residential unit on Appian Way has a craftsman design and matches the character of the neighborhood by keeping the street frontage purely residential. Below is a table of the revised development standards:

| Development Standard | Project | Allowed/Required | Compliance |
|---|---|---|---|
| Zoning | C-R, R-1 | R-1 | No* |
| Lot Area | 45,742 sq. ft. | 10,000 sq. ft. min. | Yes |
| Lot Width | 114'-8" | 70 ft. min. | Yes |
| Setbacks: | Front: Varies >237'<br>Side: 3'/20' | Front: 20'<br>Side: 20' | No** |

| Development Standard | Project | Allowed/Required | Compliance |
|---|---|---|---|
| | Rear: 7'-15' | Rear: 20' | |
| Off-Street Parking | 65 spaces | 49 Spaces | Yes |
| Floor Area Ratio (FAR) | .33 | .60 max. | Yes |
| Building Height | 35'6' | 27 feet max. | No*** |
| Perimeter Wall | 6' Masonry | 6' Masonry | Yes |

* Zone Change Requested
**Site Plan Review Requested
***Zone Variance Requested

The residential unit located on Appian Way will house the caretaker and the priest and has three dedicated parking spaces. It is proposed with a craftsman design consisting of stone and siding and has its own front yard. With the residential unit fronting on Appian Way it greatly improves the appearance along the street compared to the previously proposed parking lot and the design of the unit complements the character of the neighborhood. The residential unit is still considered an accessory use to the religious facility and is reviewed under the conditional use permit.

Conditional Use Permit
Staff has reviewed the project in accordance with Article 72 (Conditional Use Permit) of the Zoning Ordinance and advises that the project is consistent with the following required findings:

1)    *The proposed conditional use shall not be in substantial conflict with the general plan for the area.*

    Should the General Plan Amendment be approved, the land use designation for the project area that will accommodate the facility will be Low Density Residential and the proposed parking lot will be under a commercial designation. The Residential land use designation "applies to areas of the City which are developed with single family residential uses." Religious facilities are a conditionally permitted use within the corresponding Single Family Residential zoning, and are a compatible ancillary use within residential neighborhoods. The Commercial land use designation applies to the commercial corridors in Lomita including those located along Pacific Coast Highway, Lomita Boulevard, Western Avenue and the northern end of Narbonne Avenue. The parking lot is consistent because parking facilities are a necessary ancillary use for a commercial property.

2)    *The nature, condition and development of adjacent uses, buildings and structures shall be considered and no proposed conditional use shall be permitted where such use will adversely affect or be materially detrimental to said adjacent uses, buildings and structures.*

The uses adjacent to the north of the facility are commercial retail and will not be impacted by the new structure. The uses to the south are residential and with all of the requested project approvals the project will be consistent with the residential requirements by providing a six foot block wall along the entire property line and primarily keeping the height of the building at 27'. The project is required to have a site plan review for a side yard setback modification due to the height of the minaret, a unique architectural feature of mosques, and not due to the useable area of the building itself. Furthermore, the applicant has reduced the height of the minaret by five feet to 35'6". Staff has also added a condition of approval requiring all organized events be conducted inside the building, except for those which receive special event permit approval.

The applicant has reduced the size of the project and relocated the priest/caretakers residence from the Islamic Center and is now proposing a residential unit with a craftsman style design fronting along Appian Way. This unit will help to further integrate the project into the neighborhood by maintaining the residential frontage along the street.

Additionally, the project is providing 31 more parking spaces than what they currently provide and in excess of what the Code requires. This will allow for more vehicles to park on-site and alleviate on-street parking congestion within that neighborhood.

Included in this conditional use permit is the parking lot located within the C-R, Commercial Retail zone. The parking lot is located between two retail buildings which have their own parking accommodations. The width and parking stall dimensions meet requirements and will not impact the adjacent uses. This parking lot should be sufficient to accommodate the parking demand of the facility.

3)   *The site for a proposed conditional use shall be adequate in size and shape to accommodate the yards, walls, fences, parking and loading facilities, landscaping and other development features prescribed in the Zoning Ordinance, or as required as a condition in order to integrate said use with the uses in the neighborhood.*

The site is adequate in size and shape to accommodate the various aspects of the project while integrating the use into the respective commercial and residential portions of the neighborhood. As designed, the project provides parking in the commercially zoned portion of the project site and provides the religious facility and caretaker/priest's residential unit facing Appian Way, a residential street. Religious facilities have special development standards outlined within the Zoning Ordinance. The site exceeds the lot width and size requirements and is proposing a six foot perimeter block wall and required landscaping. The project is providing additional parking in excess of the Code requirement and as determined by the traffic study and occupant load projections. The project will be consistent with the residential requirements by providing a six foot block wall along the entire property line and primarily keeping the height of the building at 27'. The increased height is only associated with the minaret and the building adjacent to the residential uses will not be higher than 27'. The project is requesting a variance due to the height of the minaret only, a side yard setback modification for the north property line, and a rear yard setback modification for the residential unit facing Appian Way. Although the project requires a variance for height, it is only for the architectural minaret

*Planning Commission: September 14, 2009*
*GPA No. 2008-03, ZC No. 110, ZTA No. 2008-07, CUP No. 263, SP No. 1120 & ZV No. 216*
*Page 7 of 9*

and not for the overall size of the structure. There is no habitable space within the minaret nor will it have any noise making devices which would disrupt the neighborhood.

The parking lot within the CR zone also meets all development requirements and will provide additional parking in excess of the Code requirement.

<u>Zone Variance</u>
The applicant is requesting a zone variance to permit the 35'6" minaret in the center of the building. Previously the minaret was proposed at 40'; however, at the neighborhood's request the applicant has lowered it to 35'6". The minaret is purely an architectural feature and will not be utilized as additional useable space. Furthermore, there are no bells or other noise making devices proposed within it. The Zoning Ordinance identifies the basis from which variances are reviewed and approved. The request must be in general accord with the following standards:

1)    *That the variance is necessary for the preservation of a substantial property right of the owners, and that such variance will not be materially detrimental to the public welfare nor the property of other persons located in the vicinity thereof; or*

2)    *That there are practical difficulties or unnecessary hardships in the way of carrying out the strict letter of the Chapter, and in granting of the variance the spirit of the Chapter will be observed and substantial justice done.*

The minaret is proposed for the religious facility is a unique architectural feature of mosques traditionally used to call people for prayer. The proposed minaret is consistent in terms of height and mass with other religious facilities in Lomita. Staff reviewed three other facilities in the City located within Single Family Residential zones and found they all exceeded the building height requirements. Here is a chart of the existing facilities:

| Address | Maximum Height | Year Built |
|---|---|---|
| 2120 255th Street | 40' | 1966 |
| 24027 Pennsylvania | 47' | 1965 |
| 25501 Eshelman | 66' | 1953 |

A variance to accommodate the architecture of the proposed religious facility is reasonable and does not amount to a special privilege. Not allowing the proposed minaret would be an unnecessary hardship for this particular project. Furthermore, the minaret's location will be in the center-front of the building away from the adjacent residential uses and does not contain any habitable space.

<u>Site Plan Review</u>
Pursuant to the City's Zoning Ordinance, modifications to the regulations regarding setbacks and yards may be applied for pursuant to Article 75 "Site Plan Review" and Article 71 "Modifications" of the City's Zoning Code should there be unique features or characteristics involved. Previously the proposed project was requesting a yard modification for the side yard setback at the southern property line. With the redesign, the project now needs a yard modification for the side yard setback to the north and for the rear yard setback to the east. With the reduction in the height of the minaret the side yard setback requirement is 20'. The applicant

*Planning Commission: September 14, 2009*
*GPA No. 2008-03, ZC No. 110, ZTA No. 2008-07, CUP No. 263, SP No. 1120 & ZV No. 216*
*Page 8 of 9*

has shifted the building as far north as possible to achieve the 20' separation to the south which is adjacent to residential uses and now only has a north side yard setback of three feet. Additionally, by removing the priest/caretakers unit from inside the building and placing it on Appian Way, the project no longer meets the rear yard setback requirement of 20'. Although the applicant is now requesting another modification of Ordinance requirements, staff is more supportive of this design over the original. The land use to the north of the site is commercial and the proximity of the Center to the commercial uses will have less of an impact than on the residential uses to the south. Also, the proposed residence on Appian Way creates a cohesive residential look along the street which is far better than the previously proposed parking lot. After reviewing the proposed development in accordance with Articles 75 and 71, staff has determined that the proposed project is consistent with the following required findings:

1)   *Suitability of the site for the particular use or development intended, and the total development, including the application of prescribed development standards, shall be so arranged as to avoid traffic congestion, insure the protection of public health, safety and general welfare, prevent adverse effects on neighboring property and shall be in general accord with all elements of the general plan; and*

2)   *Suitable and functional development design, but it is not intended that such approval be interpreted to require a particular type of architecture; and*

3)   *Topographic features, subdivision plans, or other conditions create an unnecessary hardship or unreasonable regulation or make it obviously impractical to require compliance with the yard requirements or setback line.*

The site is suitable for the facility and is so arranged to avoid traffic congestion and prevent adverse impacts on the neighborhood  The design is suitable and functional because the site exceeds the lot width and size requirements and  the project is proposing a six foot perimeter block wall and required landscaping. The project is providing additional parking in excess of the Code requirement and as determined by the traffic study and occupant load projections.  The project will be consistent with the residential requirements by providing a six foot block wall along the entire property line and primarily keeping the height of the building at 27'.

Yard setback requirements are intended to maintain a separation between structures and help mitigate any impacts between adjacent residential properties. Under normal circumstances there would only be a five foot setback requirement. In this particular case, the height of the architectural minaret is increasing the setback requirement to 20'. The minaret proposed for the religious facility is a unique architectural feature of mosques. The project has the 20' required side yard setback adjacent to the residential uses and is only requesting the modification adjacent to commercial uses. The long, narrow, and odd shape of the project site makes it impractical to require two- 20 foot side yard set backs and creates an unnecessary hardship on the applicant. The modification is required to accommodate the architecture of the proposed religious facility, which is reasonable and does not amount to a special privilege, and still maintains the privacy separation between structures.

The rear yard setback varies from 7'-15' due to the unusual angle of the rear property line. This constitutes a unique feature of the property which creates an unnecessary hardship for the applicant and design of a facility. Furthermore, the neighborhood residents have stated that they

prefer having the residential unit facing Appian Way over the previously proposed parking lot which met the rear yard setback requirements.

<u>Environmental Determination</u>
This project is subject to review per the California Environmental Quality Act (CEQA).  In accordance with CEQA guidelines, an initial study was prepared to identify if the project may result in potentially significant adverse effects on the environment.  Upon completing the initial study, no areas were identified as potentially being affected.  The initial study (ND 2009-03) was made available for public review and comment on May 19, 2009.  Based on the above, no significant adverse effects are expected to result from the project.  Therefore, staff recommends that a Negative Declaration be adopted.  The negative declaration and initial study are attached to this report. CEQA does outline requirements in which negative declarations must be recirculated for public comment when a project has been "substantially revised". The changes within the proposed project are minor in nature and do not meet the qualifications of a substantial revision.

<u>Public Notice</u>
Notices of this hearing dated August 31, 2009 were mailed to property owners within 300 feet of the subject property and posted at City Hall, the Lomita Post Office, the Lomita Library, and at Lomita Park.

Recommended by:                                              Prepared by:


_____                          _____
Gary Y. Sugano                                               Alicia Heideman
Community Development Director                  Associate City Planner

Exhibits:
     a. Resolutions
     b. Staff Report dated June 8, 2009
     c. Minutes from the June 8, 2009 Planning Commission meeting
     d. Vicinity Map
     e. General Plan Map
     f. Zoning Map
     g. Aerial Map
     h. Site Plan &  Elevations
     i. Schedule of Services
     j. Negative Declaration No. 2009-03 & Initial Study
     k.  Letters from the Public

\\Athena\D\Shared\Community Development\Planning\Alicia\Islamic Center/

Complaint

Exh. C



Item No. ___6___

# CITY OF LOMITA
# CITY COUNCIL REPORT

**TO:**       City Council                        Date: March 1, 2010

**FROM:**   Gary Y. Sugano, Community Development Director

**SUBJECT:**   General Plan Amendment No. 2008-03, Zone Change No. 110, Zone Text
Amendment No. 2008-07, Conditional Use Permit No. 263, Site Plan Review No.
1120, and Zone Variance No. 216.

## RECOMMENDATION

Staff recommends 1) after the City Attorney reads the titles, that the City Council approve the
first reading of ordinances for Zone Change No. 110 and Zone Text Amendment No. 2008-07
and 2) adopt resolutions approving Negative Declaration 2009-03, General Plan Amendment No.
2008-03, Conditional Use Permit No. 263, Site Plan Review No. 1120, and Zone Variance No.
216.

## PROJECT DESCRIPTION

The applicant is the Islamic Center of South Bay - L.A. (ICSB). ICSB has been located at 25816
Walnut     Street    in    Lomita    since    ICSB    acquired    the    property    in    1985.

Currently, the prayer hall accommodates approximately 150 people. The ICSB also has a library,
four classrooms, one office, one covered patio, four bathrooms, wudu facilities (used for ritual
washing before daily prayer), and a kitchen. In 1988, ICSB purchased an adjoining 6,000 square
foot lot that faces Pacific Coast Highway. In 1997, the kitchen was located. In 2002, ICSB
purchased another adjoining approximately 25,000 square foot lot. The combined total of the
lots currently owned by ICSB is approximately 45,758 square feet.

ICSB is proposing a remodeled and expanded religious facility at 25816 Walnut Street, 25829 -
1/4, 25833, and 25833-1/2 Appian Way.  The facility requires General Plan Amendment No.
2008-03, Zone Change No. 110, Zone Text Amendment No. 2008-07, Conditional Use Permit
No. 263, Site Plan Review No. 1120, and Zone Variance No. 216 as follows:

1. An amendment to the City of Lomita General Plan Land Use Map from Commercial to
   Low Density Residential for the properties located at 25816 Walnut Street and 25829 ¼
   Appian Way;

2.  An amendment to the City's Zoning Map from C-R, Commercial Retail, to R-1, Single Family Residential for the properties located at 25816 Walnut Street and 25829 ¼ Appian Way;

3.  A request for a zone text amendment amending Section 11-1.48.02 of the Lomita Zoning Code to allow "parking lots and parking buildings" as a conditionally permitted use in the C-R (Commercial, Retail) Zone;

4.  A conditional use permit to allow a 14,320 square foot religious facility and a 1,470 square foot religious leader/caretakers unit within the R-1, Single Family Residential Zone, and a stand alone parking lot within the CR, Commercial Retail Zone;

5.  A site plan review and modification to permit a side yard setback of 3' instead of the code required 20' and to permit a rear yard setback of 7' instead of the code required 20 feet; and

6.  A request for a variance from Section 11-1.32.06(D)(1) of the Zoning Ordinance to allow building height of 35 feet, 6 inches instead of the code allowed maximum height of 27' for the properties at 25816 Walnut Street, 25829 -1/4, 25833, 25833-1/2 Appian Way, and APN No. 7553-010-032.

The project was initiated and filed by architect and ICSB's representative Shakil Patel of 25982 Hinkley St. Loma Linda, CA 92354.

## BACKGROUND

This item has been heard twice by the Planning Commission. The first hearing was held on June 8, 2009 where the item was tabled over concerns about parking, building size, and traffic. After a considerable amount of public testimony both for and against the project, the Commission directed the applicant and staff to work with the surrounding neighbors to address their concerns regarding those issues. In response, ICSB made changes to the project with respect to building size, setbacks, and height. Also, since the first Commission meeting, ICSB has eliminated all foot traffic from Appian Way, negotiated a renewable one-year lease for Friday afternoons for the parking area on 259th Pl. owned by the Methodist Church, and added additional landscaping to the project site to create a visual buffer with surrounding properties and further reduce noise from the property.

At the request of the Planning Commission, the applicant held two community outreach meetings at City Hall. Both meetings were noticed to the surrounding residents within 300 feet of the project site. At each meeting approximately 20 residents attended where they reiterated their concerns over parking, noise, foot traffic, and the architectural design of the proposed Center being incompatible with the neighborhood.

On September 14, 2009, the Planning Commission held a public hearing on the application to formulate its recommendation. During the public hearing on the proposed project, 41 people spoke in favor of the project and 15 people spoke against. Project proponents emphasized that the updated parking area will improve the existing parking situation in the neighborhood, a new facility will allow all events to take place indoors which will help keep down the noise, that the ICSB provides a positive place for youth to meet and have a sense of community belonging and participate in youth group activities, and the mosque will beautify the neighborhood. Concerns

*City Council March 1, 2010*
*GPA No. 2008-03, ZC No. 110, ZTA No. 2008-07, CUP No. 263, SP No. 1120 & ZV No. 216*
*Page 3 of 14*

raised against the project included traffic congestion, lack of parking, blocked driveways, noise, size of the building; height of the minaret, building design, and a loss of privacy.

After careful deliberation, the Commission, by a 4-3 vote, recommended City Council approval of all of the proposed entitlements for the project. Because the project includes legislative changes (amendments to the City's General Plan Land Use Map, Zoning Map and a change to the text of the Zoning Ordinance), the Planning Commission makes a recommendation to the City Council, rather than take any final action. Please see the Analysis section below for more detail.

This item was originally scheduled to be heard by the City Council on December 7, 2009. However, on December 2, 2009, the City received a letter from Anwer Khan representing the ICSB requesting postponement of the project applications in order to schedule a series of community meetings to obtain additional feedback on the project. The applicant held three community meetings at its facility and one meeting at City Hall on February 18, 2010. At that February 18th meeting approximately 25 residents attended. The meeting was fairly brief as the applicant had already been in communication with some of the residents and it had become apparent that neither side was willing to compromise any further.

## ANALYSIS

## LEGISLATIVE APPROVALS

This property is a bit unusual in that it is comprised of 4 lots. The four lots are used as one integrated use (ICSB). Three of the lots are currently zoned commercial retail (C-R) and one is residential (R-1). The ICSB is currently using the commercially zoned property as a religious institutional use. The ICSB is a *legal, nonconforming use* on that commercial site and may continue there, regardless of the outcome of these applications. Religious institutions, however, are not a permitted use on commercially zoned property, which means that a new religious institution could not be established on commercial property. This does *not* apply to ICSB because it has been in continuous use on the property since 1985. Religious institutions are a conditionally permitted use in the residential zone. Thus, in order to expand the facility, the applicant proposes re-zoning of the property to residential (R-1), except for the property on which the parking lot would be situated. Parking lots are not permitted uses in residential zones. Parking lots are also not currently permitted in the commercial retail zone; therefore, the applications also include a request to add "parking lots" as a conditionally permitted use in the commercial retail zone.

In sum, there are two basic legislative acts requested. One is an amendment to the General Plan land use map from Commercial to Low Density Residential for the subject properties and the second is a Zoning Map amendment to rezone those same two parcels from commercial (C-R) to residential (R-1). The purpose of this request is so that these parcels may be in a zone that conditionally permits religious institutions. The second is a change to the zoning ordinance in order to make "parking lots" a conditionally permitted use in the commercial retail (C-R) zone.

If these legislative changes are made, the applicant still must obtain the required CUP and other land use permits to expand the facility. If these legislative changes are not made, ICSB may continue its operations at the site but may not expand.

General Plan Designation/Amendment
The General Plan designation for the subject properties are "Commercial" and "Low Density Residential." Attachments 3 and 4 to this report map the subject property and delineate the parcels proposed for amendments. The Commercial land use designation applies to the commercial corridors in Lomita including those located along Pacific Coast Highway, Lomita Boulevard, Western Avenue and the northern end of Narbonne Avenue. The Residential land use designation applies to areas of the City which are developed predominantly with single family residential uses. The applicant is proposing a General Plan Amendment to change the commercial portion of the site to Low Density Residential.

Unless an existing legal nonconforming use, religious facilities are not permitted in the CR, Commercial Retail zone. The current use of the subject property is a legal nonconforming religious facility. The applicant is proposing a Zone Change for the site to R-1 (see below) where religious facilities are conditionally permitted; because the zoning designation for the property must be consistent with the General Plan designation, this requests also requires that the General Plan land use designation also be changed from commercial to residential. By changing the General Plan and subsequent zoning designations, the applicant will be required to obtain a conditional use permit to expand the existing facility. Through a CUP, the City may impose conditions necessary to maintain compatibility of the use with the surrounding property.

Zone Change
The project is proposing a Zone Change for two parcels changing the zoning from Commercial Retail to R-1 Single Family Residential. Although a legal nonconforming religious facility currently exists at the location, this use cannot be expanded because it is not permitted in the Commercial Retail zone; therefore both the Zoning (and the General Plan designation) must be changed prior to allowing the construction of a new facility.

| Address | Current GP/ Zoning Designation | Proposed GP/ Zoning Designation |
|---|---|---|
| 25816 Walnut Street | Commercial/C-R | Low Density Residential/R-1 |
| 25829 ¼ Appian Way | Commercial/C-R | Low Density Residential/R-1 |

Directly adjacent to the south property line the area is already zoned for and designated Single Family Residential. The site is more consistent with a residential designation because the property access is located off of Walnut Street and Appian Way, local streets, and the majority of the properties do not have direct access or visibility from Pacific Coast Highway. These factors limit the utility and suitability for commercial development on these parcels.

*City Council March 1, 2010*
*GPA No. 2008-03, ZC No. 110, ZTA No. 2008-07, CUP No. 263, SP No. 1120 & ZV No. 216*
*Page 5 of 14*

Zone Text Amendment
The applicant is also proposing to allow "parking lots and parking buildings" as a conditionally permitted use within the C-R, Commercial Retail zone. The C-R zone is established to provide for regional retail uses and limited service uses. Some of the principal uses permitted in the C-R zone include most retail uses, restaurants, limited personal services, and financial services. Parking lots and parking buildings are a permitted use within the C-G Commercial General Zone, and staff finds that it is also consistent with the intent of the Commercial Retail zone. In some areas of the City there are parking shortages, and allowing for parking facilities could help to ease this burden for future development. Furthermore, since parking lots and buildings will be a conditionally permitted use, every proposed parking facility will be reviewed by the Planning Commission for compatibility with the area prior to granting a CUP.

Planning Commission Recommendations
The applicant has proposed a comprehensive set of applications for the redevelopment of the property with a religious facility. In order to achieve the applicant's goal, the above legislative changes, General Plan Amendment, a zoning map amendment and a zone text amendment, are required in addition to administrative permits.

In most circumstances the Planning Commission approves administrative entitlements and makes recommendations to the City Council with respect to the legislative proposals. However, the Planning Commission cannot approve any administrative applications that are not consistent with the Zoning Ordinance and General Plan. Because the applications for the Site Plan Review, Variance and CUP are dependent on enactment of the proposed legislative changes, the Planning Commission has made a recommendation to the City Council based upon the entire project as a whole.

What follows is a discussion of the administrative approvals for which the Planning Commission has also recommended City Council approval.

## ADMINISTRATIVE APPROVALS ANALYSIS
Development Standards
In addition to the R-1 Single Family Residential requirements, Article 68 of the Zoning Ordinance sets forth special development standards for religious facilities. Here is a review of those development standards:

| Development Standard | Project | Allowed/Required | Compliance |
|---|---|---|---|
| Zoning | C-R, R-1 | R-1 | No* |
| Lot Area | 45,742 sq. ft. | 10,000 sq. ft. min. | Yes |
| Lot Width | 114'-8" | 70 ft. min. | Yes |
| Setbacks: | Front: Varies >237' | Front: 20' | No** |

*City Council March 1, 2010*
*GPA No. 2008-03, ZC No. 110, ZTA No. 2008-07, CUP No. 263, SP No. 1120 & ZV No. 216*
*Page 6 of 14*

| Development Standard | Project | Allowed/Required | Compliance |
|---|---|---|---|
| | Side: 3'/20'<br>Rear: 7'-15' | Side: 20'<br>Rear: 20' | |
| Off-Street Parking | 65 spaces | 49 Spaces | Yes |
| Floor Area Ratio (FAR) | .33 | .60 max. | Yes |
| Building Height | 35 feet, 6 inches | 27 feet max. | No*** |
| Perimeter Wall | 6' Masonry | 6' Masonry | Yes |

* Zone Change Requested
**Site Plan Review Requested
***Zone Variance Requested

The applicant is proposing a residential unit on Appian Way which will house the religious leader and caretaker of the property. The unit has a craftsman design and matches the character of the neighborhood by keeping the street frontage purely residential. There will be no vehicular traffic entering the site from Appian Way; all public access will come from Walnut Street and Pacific Coast Highway. The residential unit is considered an accessory use to the religious facility and is reviewed under the conditional use permit.

Traffic Study
A traffic study was prepared for the proposed project to determine the potential traffic impacts from the facility. The traffic study was prepared for the original 16,851 square foot facility and was not revised when the building was reduced in size to 14,320 square feet since the impact of a smaller building would be less significant. The traffic study concluded that there would be no additional impact because the new prayer area, the primary criteria used in determining traffic impact, is approximately the same size as the current prayer area. At peak time (Friday mid-day), the current facility generates 49 vehicle trips spread between the three access points off of Walnut Street, Appian Way, and Pacific Coast Highway. The current Level of Service for the study intersections at the AM and PM peak hour are as follows: Eshelman Ave/Pacific Coast Highway "D"; Walnut Street/ Pacific Coast Highway "C"; Appian Way/Pacific Coast Highway "F". After completion of the proposed project, the traffic study found that the project would not create any additional impact versus existing conditions. Furthermore, the parking area will be reconfigured to a more efficient design which will facilitate vehicles off of the right-of-way quicker, thus further reducing any potential of traffic impacts.

According to the applicant, the most attended events will be Friday afternoon prayer and the last Friday night of Ramadan. During these events the Center will have approximately 150 people. The occupant load of the prayer area is 147 persons. The parking requirement is determined by calculating the occupant load and dividing by three, therefore 147/3 = 49 required parking spaces. In addition to meeting for prayers, they will also have Saturday and weeknight classes

for children and adults. They are not proposing any other daycare, preschool, or private school at this facility.

**Friday Peak Hour Analysis:**

| Entrance/Intersection | Trips In | Trips Out | Existing LOS | Future LOS |
|---|---|---|---|---|
| PCH/Eshelman | 7 | 2 | D | D |
| Walnut/PCH | 34 | 34 | C | C |
| Appian/Cayuga/PCH | 8 | 10 | F | F |

This project was reviewed by the City's Public Safety Traffic Commission on February 25, 2009. The Commission reviewed the proposed parking lot design and potential impacts on the adjacent streets. They determined that by increasing the number of existing on-site parking spaces, and by consolidating the different buildings into one structure, the new design would improve the existing traffic flow within the parking area and along the adjacent streets.

Conditional Use Permit
Staff has reviewed the project in accordance with Article 72 (Conditional Use Permit) of the Zoning Ordinance and advises that the project is consistent with the following required findings:

1)      *The proposed conditional use shall not be in substantial conflict with the general plan for the area.*

Should the General Plan Amendment be approved, the land use designation for the project area that will accommodate the facility will be Low Density Residential and the proposed parking lot will be under a commercial designation. The Residential land use designation "applies to areas of the City which are developed with single family residential uses." Religious facilities are a conditionally permitted use within the corresponding Single Family Residential zoning, and are a compatible ancillary use within residential neighborhoods. The Commercial land use designation applies to the commercial corridors in Lomita including those located along Pacific Coast Highway, Lomita Boulevard, Western Avenue and the northern end of Narbonne Avenue. The parking lot is consistent because parking facilities are a necessary ancillary use for a commercial property.

2)      *The nature, condition and development of adjacent uses, buildings and structures shall be considered and no proposed conditional use shall be permitted where such use will adversely affect or be materially detrimental to said adjacent uses, buildings and structures.*

The uses adjacent to the north of the facility are commercial retail and will not be impacted by the new structure. The uses to the south are residential and with all of the requested project approvals the project will be consistent with the residential requirements by providing a six foot block wall along the entire property line and

City Council March 1, 2010
GPA No. 2008-03, ZC No. 110, ZTA No. 2008-07, CUP No. 263, SP No. 1120 & ZV No. 216
Page 8 of 14

primarily keeping the height of the building at 27'. The project is required to have a site plan review for a side yard setback modification due to the height of the minaret, a unique architectural feature of mosques, and not due to the useable area of the building itself. Furthermore, the applicant has reduced the height of the minaret by five feet to 35'6". Staff has also added a condition of approval requiring all organized events be conducted inside the building, except for those which receive special event permit approval.

The applicant has reduced the size of the project and relocated the religious leader/caretakers residence from the Islamic Center and is now proposing a residential unit with a craftsman style design fronting along Appian Way. This unit will help to further integrate the project into the neighborhood by maintaining the residential frontage along the street.

Additionally, the project is providing 35 more parking spaces than what they currently provide and in excess of what the Code requires. This will allow for more vehicles to park on-site and alleviate on-street parking congestion within that neighborhood.

Included in this conditional use permit is the parking lot located within the C-R, Commercial Retail zone. The parking lot is located between two retail buildings which have their own parking accommodations. The width and parking stall dimensions meet requirements and will not impact the adjacent uses. This parking lot should be sufficient to accommodate the parking demand of the facility.

3)   *The site for a proposed conditional use shall be adequate in size and shape to accommodate the yards, walls, fences, parking and loading facilities, landscaping and other development features prescribed in the Zoning Ordinance, or as required as a condition in order to integrate said use with the uses in the neighborhood.*

The site is adequate in size and shape to accommodate the various aspects of the project while integrating the use into the respective commercial and residential portions of the neighborhood. As designed, the project provides parking in the commercially zoned portion of the project site and provides the religious facility and caretaker/religious leader's residential unit facing Appian Way, a residential street. Religious facilities have special development standards outlined within the Zoning Ordinance. The site exceeds the lot width and size requirements and is proposing a six foot perimeter block wall and required landscaping. The project is providing additional parking in excess of the Code requirement and as determined by the traffic study and occupant load projections. The project will be consistent with the residential requirements by providing a six foot block wall along the entire property line and primarily keeping the height of the building at 27'. The increased height is only associated with the minaret and the building adjacent to the residential uses will not be higher than 27'.   The project is requesting a variance due to the height of the minaret only, a side yard setback modification for the north property line, and a rear yard setback modification for the residential unit facing Appian Way. Although the project requires a variance for height, it is only for the architectural minaret

and not for the overall size of the structure. There is no habitable space within the minaret nor will it have any noise making devices which would disrupt the neighborhood.

The parking lot within the CR zone also meets all development requirements and will provide additional parking in excess of the Code requirement.

Zone Variance

The applicant is requesting a zone variance to permit the 35'6" minaret in the center of the building. Previously the minaret was proposed at 40'; however, at the neighborhood's request the applicant has lowered it to 35'6". The minaret is purely an architectural feature and will not be utilized as additional useable space. Furthermore, there are no bells or other noise making devices proposed within it. The Zoning Ordinance identifies the basis from which variances are reviewed and approved. The request must be in general accord with the following standards:

1)    *That the variance is necessary for the preservation of a substantial property right of the owners, and that such variance will not be materially detrimental to the public welfare nor the property of other persons located in the vicinity thereof; or*

2)    *That there are practical difficulties or unnecessary hardships in the way of carrying out the strict letter of the Chapter, and in granting of the variance the spirit of the Chapter will be observed and substantial justice done.*

The minaret is proposed for the religious facility is a unique architectural feature of mosques traditionally used to call people for prayer. The proposed minaret is consistent in terms of height and mass with other religious facilities in Lomita. Staff reviewed three other facilities in the City located within Single Family Residential zones and found they all exceeded the building height requirements. Here is a chart of the existing facilities:

| Address | Maximum Height | Year Built |
|---|---|---|
| 2120 255th Street | 40' | 1966 |
| 24027 Pennsylvania | 47' | 1965 |
| 25501 Eshelman | 66' | 1953 |

A variance to accommodate the architecture of the proposed religious facility is reasonable and does not amount to a special privilege. Not allowing the proposed minaret would be an unnecessary hardship for this particular project. Furthermore, the minaret's location will be in the center-front of the building away from the adjacent residential uses and does not contain any habitable space.

Site Plan Review

Pursuant to the City's Zoning Ordinance, modifications to the regulations regarding setbacks and yards may be applied for pursuant to Article 75 "Site Plan Review" and Article 71 "Modifications" of the City's Zoning Code should there be unique features or characteristics involved. Previously the proposed project was requesting a yard modification for the side yard setback at the southern property line. With the redesign, the project now needs a yard modification for the side yard setback to the north and for the rear yard setback to the east. With

*City Council March 1, 2010*
*GPA No. 2008-03, ZC No. 110, ZTA No. 2008-07, CUP No. 263, SP No. 1120 & ZV No. 216*
*Page 10 of 14*

the reduction in the height of the minaret the side yard setback requirement is 20'. The applicant has shifted the building as far north as possible to achieve the 20' separation to the south which is adjacent to residential uses and now only has a north side yard setback of three feet. Additionally, by removing the religious leader/caretakers unit from inside the building and placing it on Appian Way, the project no longer meets the rear yard setback requirement of 20'. Although the applicant is now requesting another modification of Ordinance requirements, staff is more supportive of this design over the original. The land use to the north of the site is commercial and the proximity of the Center to the commercial uses will have less of an impact than on the residential uses to the south. Also, the proposed residence on Appian Way creates a cohesive residential look along the street which is far better than the previously proposed parking lot. After reviewing the proposed development in accordance with Articles 75 and 71, staff has determined that the proposed project is consistent with the following required findings:

1)   *Suitability of the site for the particular use or development intended, and the total development, including the application of prescribed development standards, shall be so arranged as to avoid traffic congestion, insure the protection of public health, safety and general welfare, prevent adverse effects on neighboring property and shall be in general accord with all elements of the general plan; and*

2)   *Suitable and functional development design, but it is not intended that such approval be interpreted to require a particular type of architecture; and*

3)   *Topographic features, subdivision plans, or other conditions create an unnecessary hardship or unreasonable regulation or make it obviously impractical to require compliance with the yard requirements or setback line.*

The site is suitable for the facility and is so arranged to avoid traffic congestion and prevent adverse impacts on the neighborhood. The design is suitable and functional because the site exceeds the lot width and size requirements and the project is proposing a six foot perimeter block wall and required landscaping. The project is providing additional parking in excess of the code requirement and as determined by the traffic study and occupant load projections. The project will be consistent with the residential requirements by providing a six foot block wall along the entire property line and primarily keeping the height of the building at 27'.

Yard setback requirements are intended to maintain a separation between structures and help mitigate any impacts between adjacent residential properties. Under normal circumstances there would only be a five foot setback requirement. In this particular case, the height of the architectural minaret is increasing the setback requirement to 20'. The minaret proposed for the religious facility is a unique architectural feature of mosques. The project has the 20' required side yard setback adjacent to the residential uses and is only requesting the modification adjacent to commercial uses. The long, narrow, and odd shape of the project site makes it impractical to require two- 20 foot side yard set backs and creates an unnecessary hardship on the applicant. The modification is required to accommodate the architecture of the proposed religious facility, which is reasonable and does not amount to a special privilege, and still maintains the privacy separation between structures.

The rear yard setback varies from 7'-15' due to the unusual angle of the rear property line. This constitutes a unique feature of the property which creates an unnecessary hardship for the applicant and design of the facility. Furthermore, the neighborhood residents have stated that they prefer having the residential unit facing Appian Way over the previously proposed parking lot which met the rear yard setback requirements.

RLUIPA Issues

The mosque and ICSB have been at its present location for more than 20 years. The applications before the City Council seek to improve the facilities. During the course of the processing of the application, representatives of the applicant have raised the Religious Land Use and Institutionalized Persons Act (RLUIPA) as a source of additional protection of this proposal with respect to the application of the City's zoning ordinance. Because this is an important (and often misunderstood) statute, this portion of the report will briefly discuss RLUIPA and its application to this proposal. RLUIPA states in relevant part that:

> "No government shall impose or implement a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution, unless the government demonstrates that imposition of the burden on that person, assembly, or institution (A) is in furtherance of a compelling governmental interest; and (B) is the least restrictive means of furthering that compelling governmental interest."

42 U.S.C. 2000cc. The statute does not define "substantial burden." The Ninth Circuit (which is the jurisdiction controlling California) appears to have settled on a definition combining free exercise jurisprudence and the Merriam-Webster Collegiate Dictionary:

> "[F]or a land use regulation to impose a 'substantial burden,' it must be 'oppressive' to a 'significantly great' extent. That is, a 'substantial burden' on 'religious exercise' must impose a significantly great restriction or onus upon such an exercise."

*San Jose Christian College v. City of Morgan Hill*, 360 F.3d 1024, 1034 (9th Cir., 2004); cited with approval in *Guru Nanak Sikh Society of Yuba City v. County of Sutter*, 456 F.3d 978, 988 (9th Cir., 2006).

The *County of Sutter* decision is often cited to support the argument that denial of variances or use permits violate RLUIPA. That case involves repeated application denials effectively prohibiting all possible building sites for the plaintiff's worship center, in violation of RLUIPA. Because ICSB has not been prohibited from construction or operation entirely the reasoning of the *County of Sutter* case appears to have little application to the ICSB situation. Notably, there are other properly zoned properties in the City available for the proposed uses.

The *County of Sutter* case involved a pair of denials which effectively banned the plaintiffs from constructing their worship center anywhere in defendant's jurisdiction. The first application by the plaintiffs was for a small site, less than two acres, in a residential area. That application was

*City Council March 1, 2010*
*GPA No. 2008-03, ZC No. 110, ZTA No. 2008-07, CUP No. 263, SP No. 1120 & ZV No. 216*
*Page 12 of 14*

rejected because of concerns about traffic, noise, and similar impacts on a residential area. In response, plaintiffs purchased a 38-acre site surrounded by agricultural uses, and proposed to put their buildings near the center of the site to minimize impacts. Other denominations had constructed similar worship centers in the area. This site was also rejected, with the county citing concerns about incompatibility with the surrounding agricultural uses, and wanting to avoid "leapfrog development" where land was left vacant between islands of development.

This set of denials clearly put the plaintiffs in an impossible situation. They were forbidden to build near residences due to development impacts, but they were also forbidden to build in a remote area which would avoid those impacts. Those facts were critical in the Ninth's Circuit's finding of an RLUIPA violation:

> "The net effect of the County's two denials—including their underlying rationales and disregard for Guru Nanak's accepted mitigation conditions—is to shrink the large amount of land theoretically available to Guru Nanak under the Zoning Code to several scattered parcels that the County may or may not ultimately approve. Because the County's actions have to a significantly great extent lessened the prospect of Guru Nanak being able to construct a temple in the future, the County has imposed a substantial burden on Guru Nanak's religious exercise."

*County of Sutter, supra,* 456 F.3d at 992. These facts are clearly distinguishable from the ICSB application. ICSB is permitted to continue at its current site as a nonconforming use and may build, albeit with the height, setback and other zoning limitations on its residentially zoned parcel.

The Ninth Circuit has held that a re-zoning denial did not violate RLUIPA. In *San Jose Christian College v. City of Morgan Hill* (360 F.3d 1024, (9th Cir., 2004)), the plaintiff submitted a re-zoning application to allow construction of a church school. The city denied the application as incomplete, requesting, among other things, information necessary to carry out the CEQA analysis. Rather than submit additional information, the applicant sued under RLUIPA. The Court found that the denial did not impose a substantial burden in violation of RLUIPA, noting:

> "College identifies the substantial burden in this case as its inability to use its own property 'to carry on its mission[s] of Christian education and transmitting its religious beliefs.' As stated previously, however, it appears that College is simply adverse to complying with the [Planned Unit Development] ordinance's requirements. The City's ordinance imposes no restriction whatsoever on College's religious exercise; it merely requires College to submit a *complete* application, as is required of all applicants."

*City of Morgan Hill, supra,* 360 F.3d at 1035. Also similar to the ICSB situation, other sites were available for the plaintiff to carry out its religious purposes:

> "[T]he City's regulations in this case do not render religious exercise effectively impracticable. As noted above, while the [Planned Unit Development] ordinance

may have rendered College unable to provide education and/or worship at the Property, there is no evidence in the record demonstrating that College was precluded from using other sites within the city."

*Id.* at 1035. RLUIPA has never been found to have such power as to force a city to approve CUPs, modifications, zone changes and variances where other appropriately zoned properties exist and the neutral application of the zoning code does not differently affect a religious institution. RLUIPA is a relatively new statute and new cases interpreting it are expected. The most important thing to remember is that, generally speaking, the City may not impose or implement a land use regulation in a manner that imposes a substantial burden on the religious exercise of any person or a religious institution. Staff has not seen any evidence yet that suggests that the application of the City's zoning regulations to ICSB creates a substantial burden on its religious exercise within the meaning of RLUIPA.

Environmental Determination
This project is subject to review per the California Environmental Quality Act (CEQA). In accordance with CEQA guidelines, an initial study was prepared to identify if the project may result in potentially significant adverse effects on the environment. Upon completing the initial study, no areas were identified as potentially being affected. The initial study (ND 2009-03) was made available for public review and comment on May 19, 2009. Based on the above, no significant adverse effects are expected to result from the project. Therefore, staff recommends that a Negative Declaration be adopted. The negative declaration and initial study are attached to this report.

**FISCAL IMPACT**
There will be no fiscal impact to the City in adopting the proposed legislative amendments or the administrative entitlements.

**ALTERNATIVES**
1) Give staff direction to prepare denial resolutions to be brought back at the next City Council meeting.
2) Provide staff with alternative direction.

Prepared by:                                        Approved by:

Alicia Heideman                                   John Jalili
Associate City Planner                          Interim City Manager

Recommended by:

Gary Y. Sugano
Community Development Director

Complaint

# Exh. D

RESOLUTION NO.

A RESOLUTION OF THE PLANNING COMMISSION OF THE CITY OF LOMITA RECOMMENDING CITY COUNCIL APPROVAL OF GENERAL PLAN AMENDMENT NO. 2008-03 AMENDING THE CITY OF LOMITA GENERAL PLAN LAND USE MAP FROM COMMERCIAL TO LOW DENSITY RESIDENTIAL FOR THE PROPERTIES LOCATED AT 25816 WALNUT STREET AND 25829 ¼ APPIAN WAY. INITIATED AND FILED BY SHAKIL PATEL OF 25982 HINKLEY ST. LOMA LINDA, CA 92354.

<u>Section 1. Recitals</u>

A.  The Planning Commission of the City of Lomita has considered an application for a General Plan Amendment No. 2008-03, Zone Change No. 110, Zone Text Amendment No. 2008-07, Conditional Use Permit No. 263, Site Plan Review No. 1120, and Zone Variance No. 216, an amendment to the City of Lomita General Plan Land Use Map from Commercial to Low Density Residential and an amendment to the City's Zoning Map from C-R, Commercial Retail, to R-1, Single Family Residential for the properties located at 25816 Walnut Street and 25829 ¼ Appian Way; a request for a zone text amendment amending Section 11-1.48.02 of the Lomita Zoning Code to allow "parking lots and parking buildings" as a conditionally permitted use in the C-R (Commercial, Retail) Zone; a conditional use permit to allow a 14,320 square foot religious facility and a 1,470 square foot priest/caretakers unit within the R-1, Single Family Residential Zone, and a stand alone parking lot within the CR, Commercial Retail Zone; a site plan review to permit a side yard setback of 3' instead of the code required 20' and to permit a rear yard setback of 7' instead of the code required 20', and; a request for a variance from Section 11-1.32.06(D)(1) of the Zoning Ordinance to allow building height of 35'6" instead of the code allowed maximum height of 27' for the properties at 25816 Walnut Street, 25829 -1/4, 25833, 25833-1/2 Appian Way, and APN No. 7553-010-032.  Initiated and filed by Shakil Patel of 25982 Hinkley St. Loma Linda, CA 92354.

B.  Pursuant to Section 15070 of the California Code of Regulations an initial study was prepared and a determination has been made that there is no substantial evidence that the proposed amendment may have a significant effect on the environment, and accordingly a Negative Declaration was prepared and posted for public review.

C.  On June 8, 2009, the Planning Commission held a duly noticed public hearing and accepted public testimony, where the item was continued off-calendar.

D.  On September 14, 2009, the Planning Commission held a duly noticed public hearing and considered additional testimony on the application.

E.  Religious Facilities are not permitted in the CR, Commercial Retail zone, although the current use of the property is a legal nonconforming religious facility in the CR Zone.

F.  The applicant has applied for, and the Commission is recommending approval of, a Zone Change for the site to R-1 (see below) where religious facilities are conditionally permitted; however, the zoning designation for the property must be consistent with the General Plan designation, requiring that the General Plan also be changed from commercial to residential.

Resolution No.
Page 2 of 3

Section 2. The existing religious facility is located on a property that is currently designated commercial and contains a nonconforming use, as residential facilities are not permitted on property designated for commercial uses. The City Council has indicated an intent in Section 11-1.76.00(b) to restrict further investments that would make nonconformities more permanent in their location in inappropriate districts. The Planning Commission finds the proposed General Plan Amendment is in the public interest because by changing the General Plan and subsequent zoning designations, the applicant can eliminate an existing nonconformity in the City and redevelop the property in a manner that conforms to the Zoning Ordinance. The property is appropriate for a residential designation because the area directly adjacent to the south property line is already zoned for and designated Single Family Residential. The site is more consistent with the adjacent residential designation because the property access is located off of Walnut St. and Appian Way, local streets, and the property does not have visibility from Pacific Coast Highway. These factors limit the utility and suitability for commercial development on these parcels.

Section 3. The Planning Commission of the City of Lomita hereby recommends to the City Council approval of General Plan Amendment No. 2008-03 amending the General Plan Land Use Map from Commercial to Low Density Residential for the properties located at 25816 Walnut Street and 25829 ¼ Appian Way and as shown in Attachment 1.

PASSED and ADOPTED by the Planning Commission of the City of Lomita on this 14th day of September, 2009 by the following vote:

> AYES:      Commissioners:
>
> NOES:      Commissioners:
>
> ABSENT:  Commissioners:

_____
Augustine Hermenegildo, Chair

ATTEST: _____
　　　　Gary Y. Sugano
　　　　Community Development Director

Within fifteen (15) days of the date of this decision for an exception, permit, change of zone, or other approval, or by the person the revocation of whose permit, exception, change of zone, or other approval is under consideration, of notice of the action of, or failure to act by, the Commission, any person dissatisfied with the action of, or the failure to act by, the Commission may file with the City Clerk an appeal from such action upon depositing with said Clerk an amount specified by resolution of the City Council.

Resolution No.
 Page 3 of 3

Any action to challenge the final decision of the City made as a result of the public hearing on this application must be filed within the time limits set forth in Code of Civil Procedure Section 1094.6.

\\Athena\D\Shared\Community Development\Planning\Alicia\Islamic Center\_PC_Resolution GPA.doc

Complaint

Exh. E

RESOLUTION NO.

A RESOLUTION OF THE PLANNING COMMISSION OF THE CITY OF LOMITA
RECOMMENDING CITY COUNCIL APPROVAL OF ZONE CHANGE NO. 110 AN
AMENDMENT TO THE CITY'S ZONING MAP FROM C-R, COMMERCIAL
RETAIL, TO R-1, SINGLE FAMILY RESIDENTIAL FOR THE PROPERTIES
LOCATED AT 25816 WALNUT STREET AND 25829 ¼ APPIAN WAY.
INITIATED AND FILED BY SHAKIL PATEL OF 25982 HINKLEY ST. LOMA
LINDA, CA 92354.

<u>Section 1. Recitals</u>

A.   The Planning Commission of the City of Lomita has considered an application for a General Plan
     Amendment No. 2008-03, Zone Change No. 110, Zone Text Amendment No. 2008-07,
     Conditional Use Permit No. 263, Site Plan Review No. 1120, and Zone Variance No. 216, an
     amendment to the City of Lomita General Plan Land Use Map from Commercial to Low Density
     Residential and an amendment to the City's Zoning Map from C-R, Commercial Retail, to R-1,
     Single Family Residential for the properties located at 25816 Walnut Street and 25829 ¼ Appian
     Way; a request for a zone text amendment amending Section 11-1.48.02 of the Lomita Zoning
     Code to allow "parking lots and parking buildings" as a conditionally permitted use in the C-R
     (Commercial, Retail) Zone; a conditional use permit to allow a 14,320 square foot religious
     facility and a 1,470 square foot priest/caretakers unit within the R-1, Single Family Residential
     Zone, and a stand alone parking lot within the CR, Commercial Retail Zone; a site plan review to
     permit a side yard setback of 3' instead of the code required 20' and to permit a rear yard setback
     of 7' instead of the code required 20', and; a request for a variance from Section 11-
     1.32.06(D)(1) of the Zoning Ordinance to allow building height of 35'6" instead of the code
     allowed maximum height of 27' for the properties at 25816 Walnut Street, 25829 -1/4, 25833,
     25833-1/2 Appian Way, and APN No. 7553-010-032.  Initiated and filed by Shakil Patel of
     25982 Hinkley St. Loma Linda, CA 92354.

B.   Pursuant to Section 15070 of the California Code of Regulations an initial study was prepared
     and a determination has been made that there is no substantial evidence that the proposed
     amendment may have a significant effect on the environment, and accordingly a Negative
     Declaration was prepared and posted for public review.

C.   On June 8, 2009, the Planning Commission held a duly noticed public hearing and accepted
     public testimony; where the item was continued off-calendar.

D.   On September 14, 2009, the Planning Commission held a duly noticed public hearing and
     considered additional testimony on the application.

E.   The project is proposing a Zone Change for two parcels changing the zoning from Commercial
     Retail to R-1 Single Family Residential. Although the religious facility currently exists at the
     location, this use is not permitted in the Commercial Retail zone; therefore, both the Zoning (and
     the General Plan designation) must be changed prior to allowing the construction of a new
     facility.

Resolution No.
Page 2 of 2

Section 2. The Planning Commission finds that the proposed Zone Change No. 110, changing the zoning from Commercial Retail to R-1 Single Family Residential is consistent with the General Plan because this property is not suitable for commercial development so it is consistent to rezone it to an appropriate designation. The property directly adjacent to the south is already zoned for and designated Single Family Residential. The site is more consistent with the adjacent residential designation because the property access is located off of Walnut St. and Appian Way, local streets, and the property does not have visibility from Pacific Coast Highway. These factors limit the utility and suitability for commercial development on these parcels.

Section 3. The Planning Commission of the City of Lomita hereby recommends to the City Council approval of Zone Change No. 110 an amendment to the City's Zoning Map from C-R, Commercial Retail, to R-1, Single Family Residential for the properties at 25816 Walnut Street and 25829 ¼ Appian Way, as specifically shown in Attachment 2.

PASSED and ADOPTED by the Planning Commission of the City of Lomita on this 14th day of September, 2009 by the following vote:

AYES:      Commissioners:

NOES:      Commissioners:

ABSENT:  Commissioners:


_____
Augustine Hermenegildo, Chair


ATTEST: _____
Gary Y. Sugano
Community Development Director

Within fifteen (15) days of the date of this decision for an exception, permit, change of zone, or other approval, or by the person the revocation of whose permit, exception, change of zone, or other approval is under consideration, of notice of the action of, or failure to act by, the Commission, any person dissatisfied with the action of, or the failure to act by, the Commission may file with the City Clerk an appeal from such action upon depositing with said Clerk an amount specified by resolution of the City Council.

Any action to challenge the final decision of the City made as a result of the public hearing on this application must be filed within the time limits set forth in Code of Civil Procedure Section 1094.6.


\\Athena\D\Shared\Community Development\Planning\Alicia\Islamic Center\_PC_Resolution ZC.doc

Complaint

# Exh. F

RESOLUTION NO.

A RESOLUTION OF THE PLANNING COMMISSION OF THE CITY OF LOMITA RECOMMENDING CITY COUNCIL APPROVAL OF ZONE TEXT AMENDMENT NO. 2008-07 AMENDING SECTION 11-1.48.04 OF THE LOMITA ZONING CODE TO ALLOW "PARKING LOTS AND PARKING BUILDINGS" AS A CONDITIONALLY PERMITTED USE IN THE C-R (COMMERCIAL, RETAIL) ZONE. INITIATED AND FILED BY SHAKIL PATEL OF 25982 HINKLEY ST. LOMA LINDA, CA 92354.

Section 1. Recitals

A.   The Planning Commission of the City of Lomita has considered an application for a General Plan Amendment No. 2008-03, Zone Change No. 110, Zone Text Amendment No. 2008-07, Conditional Use Permit No. 263, Site Plan Review No. 1120, and Zone Variance No. 216, an amendment to the City of Lomita General Plan Land Use Map from Commercial to Low Density Residential and an amendment to the City's Zoning Map from C-R, Commercial Retail, to R-1, Single Family Residential for the properties located at 25816 Walnut Street and 25829 ¼ Appian Way; a request for a zone text amendment amending Section 11-1.48.02 of the Lomita Zoning Code to allow "parking lots and parking buildings" as a conditionally permitted use in the C-R (Commercial, Retail) Zone; a conditional use permit to allow a 14,320 square foot religious facility and a 1,470 square foot priest/caretakers unit within the R-1, Single Family Residential Zone, and a stand alone parking lot within the CR, Commercial Retail Zone; a site plan review to permit a side yard setback of 3' instead of the code required 20' and to permit a rear yard setback of 7' instead of the code required 20', and; a request for a variance from Section 11-1.32.06(D)(1) of the Zoning Ordinance to allow building height of 35'6" instead of the code allowed maximum height of 27' for the properties at 25816 Walnut Street, 25829 -1/4, 25833, 25833-1/2 Appian Way, and APN No. 7553-010-032.  Initiated and filed by Shakil Patel of 25982 Hinkley St. Loma Linda, CA 92354.

B.   Pursuant to Section 15070 of the California Code of Regulations an initial study was prepared and a determination has been made that there is no substantial evidence that the proposed amendment may have a significant effect on the environment, and accordingly a Negative Declaration was prepared and posted for public review.

C.   On June 8, 2009, the Planning Commission held a duly noticed public hearing and accepted public testimony; where the item was continued off-calendar.

D.   On September 14, 2009, the Planning Commission held a duly noticed public hearing and considered additional testimony on the application.

Section 2.  The Planning Commission finds that a zone text amendment amending Section 11-1.48.02 of the Lomita Zoning Code to allow "parking lots and parking buildings" as a conditionally permitted use in the C-R (Commercial, Retail) Zone is consistent with the General Plan because the C-R zone is established to provide for regional retail uses and limited service uses in which parking is an accessory use to. Parking lots and parking buildings are a permitted use within other commercial zones in the City, such as the C-G Commercial General Zone which has the same General Plan designation as the C-R zone. Providing parking opportunities as a conditionally permitted use within this zone is consistent with the intent of the Zoning and the

Resolution No.
Page 2 of 2

General Plan designation, which is to encourage retail and service uses and to manage development in a manner consistent with the historic development trend of permitted parking lots in areas zoned for commercial uses. In some areas of the City there are parking shortages, and allowing for parking facilities may ease this burden for future development.

<u>Section 3.</u> The Planning Commission of the City of Lomita hereby recommends to the City Council approval of Zone Text Amendment No. 2008-07 amending Section 11-1.48.04 to add "parking lots and parking buildings" as number 8 in the alphabetical list of conditionally permitted uses in the C-R (Commercial, Retail) Zone and renumber the remaining uses as follows:

(8)  Parking lots and parking buildings
(9)  Private clubs.
(10) Restaurants and cafes serving alcoholic beverages, pursuant to article 56 of the Lomita Zoning Code.

PASSED and ADOPTED by the Planning Commission of the City of Lomita on this 14th day of September, 2009 by the following vote:

AYES:      Commissioners:

NOES:      Commissioners:

ABSENT:  Commissioners:

_____
Augustine Hermenegildo, Chair

ATTEST: _____
Gary Y. Sugano
Community Development Director

Within fifteen (15) days of the date of this decision for an exception, permit, change of zone, or other approval, or by the person the revocation of whose permit, exception, change of zone, or other approval is under consideration, of notice of the action of, or failure to act by, the Commission, any person dissatisfied with the action of, or the failure to act by, the Commission may file with the City Clerk an appeal from such action upon depositing with said Clerk an amount specified by resolution of the City Council.

Any action to challenge the final decision of the City made as a result of the public hearing on this application must be filed within the time limits set forth in Code of Civil Procedure Section 1094.6.

\\Athena\D\Shared\Community Development\Planning\Alicia\Islamic Center\_PC_Resolution ZTA.doc

Complaint
# Exh. G

RESOLUTION NO.

A RESOLUTION OF THE PLANNING COMMISSION OF THE CITY OF LOMITA RECOMMENDING CITY COUNCIL APPROVAL OF ZONE VARIANCE NO. 216 FROM SECTION 11-1.32.06(D)(1) OF THE ZONING ORDINANCE TO ALLOW BUILDING HEIGHT OF 35 FEET SIX INCHES INSTEAD OF THE CODE ALLOWED MAXIMUM HEIGHT OF 27 FEET FOR THE PROPERTIES LOCATED AT 25816 WALNUT STREET, 25829 -1/4, 25833, 25833-1/2 APPIAN WAY, AND APN NO. 7553-010-032. INITIATED AND FILED BY SHAKIL PATEL OF 25982 HINKLEY ST. LOMA LINDA, CA 92354.

Section 1. Recitals

A.   The Planning Commission of the City of Lomita has considered an application for a General Plan Amendment No. 2008-03, Zone Change No. 110, Zone Text Amendment No. 2008-07, Conditional Use Permit No. 263, Site Plan Review No. 1120, and Zone Variance No. 216, an amendment to the City of Lomita General Plan Land Use Map from Commercial to Low Density Residential and an amendment to the City's Zoning Map from C-R, Commercial Retail, to R-1, Single Family Residential for the properties located at 25816 Walnut Street and 25829 ¼ Appian Way; a request for a zone text amendment amending Section 11-1.48.02 of the Lomita Zoning Code to allow "parking lots and parking buildings" as a conditionally permitted use in the C-R (Commercial, Retail) Zone; a conditional use permit to allow a 14,320 square foot religious facility and a 1,470 square foot priest/caretakers unit within the R-1, Single Family Residential Zone, and a stand alone parking lot within the CR, Commercial Retail Zone; a site plan review to permit a side yard setback of 3' instead of the code required 20' and to permit a rear yard setback of 7' instead of the code required 20', and; a request for a variance from Section 11-1.32.06(D)(1) of the Zoning Ordinance to allow building height of 35'6" instead of the code allowed maximum height of 27' for the properties at 25816 Walnut Street, 25829 -1/4, 25833, 25833-1/2 Appian Way, and APN No. 7553-010-032.  Initiated and filed by Shakil Patel of 25982 Hinkley St. Loma Linda, CA 92354.

B.   Pursuant to Section 15070 of the California Code of Regulations an initial study was prepared and a determination has been made that there is no substantial evidence that the proposed amendment may have a significant effect on the environment, and accordingly a Negative Declaration was prepared and posted for public review.

C.   On June 8, 2009, the Planning Commission held a duly noticed public hearing and accepted public testimony; where the item was continued off-calendar.

D.   On September 14, 2009 the Planning Commission held a duly noticed public hearing and accepted additional testimony on the application.

E.   The Planning Commission cannot approve any administrative applications that are not consistent with the zoning ordinance and General Plan as it currently exists.  Because the applications for the site plan review, the variance and the CUP are dependent on enactment of the proposed legislative changes, the Planning Commission will make a recommendation to the City Council with respect to these administrative applications, consistent with its recommendation on the legislative applications, and the City Council will consider the Planning Commission's recommendations and the applications all together.

Resolution No.
Page 2 of 5

F.   Since General Plan Amendment No. 2008-03, Zone Change No. 110, Zone Text Amendment No. 2008-07 have not been adopted by the City Council at the time of this hearing, the findings set forth by the Planning Commission are hypothetical and reflect the recommendation of the Planning Commission should the General Plan, Zoning Map and Zoning Text be amended in the manner requested by the applicant. This resolution also contains proposed conditions that the Planning Commission recommends for inclusion in the final decision on this permit.

Section 2. Pursuant to Article 72 of the Lomita Municipal Code, the Planning Commission of the City of Lomita finds, after due study and deliberation that the following circumstances will exist upon adoption of General Plan Amendment No. 2008-03, Zone Change No. 110, Zone Text Amendment No. 2008-07:

1)   *That the variance is necessary for the preservation of a substantial property right of the owners, and that such variance will not be materially detrimental to the public welfare nor the property of other persons located in the vicinity thereof; or*

2)   *That there are practical difficulties or unnecessary hardships in the way of carrying out the strict letter of the Chapter, and in granting of the variance the spirit of the Chapter will be observed and substantial justice done.*

The minaret proposed for the religious facility is a unique architectural feature of mosques traditionally used to call people for prayer. The proposed minaret is consistent in terms of height and mass with other religious facilities in Lomita. Staff reviewed three other facilities in the City located within Single Family Residential zones and found they all exceeded the building height requirements. The existing religious facility located at 25501 Eshelman has a maximum height of 66 feet and was built in 1953. The facilities located at 2120 255th Street and 24027 Pennsylvania, built in 1965 and 1966, also exceed building height requirements with maximum heights of 40 feet and 47 feet, respectively.

A variance to accommodate the architecture of the proposed religious facility is reasonable and does not amount to a special privilege. Not allowing the proposed minaret would be an unnecessary hardship for this particular project. Furthermore, the minaret's location will be in the center-front of the building away from the adjacent residential uses and does not contain any habitable space.

Section 3. The Planning Commission of the City of Lomita hereby recommends City Council approval Zone Variance No. 216 and the negative declaration subject to the attached proposed conditions.

**GENERAL PROJECT CONDITIONS**

1.   This permit is granted for the property described in the application on file with the Planning Division, and may not be transferred from one property to another.

2.   This permit is granted for the plans dated September 8th, 2009 ("the plans") on file with the Planning Division. The project shall conform to the plans, except as otherwise specified in these conditions, or unless a minor modification to the plans is approved by the Community

Resolution No.
Page 3 of 5

Development Director. A minor modification (up to 10%) may be granted for minimal changes or increases in the extent of use or size of structures or of the design, materials or colors of structures or masonry walls. Any application for a minor modification to the project shall be accompanied by three copies of plans reflecting the requested modification, together with applicable processing fees.

3. This permit shall automatically become null and void 12 months from the date of its issuance, unless Developer has diligently developed the proposed project, as shown by the issuance of a grading, foundation, or building permit and the construction of substantial improvements, or the beginning of the proposed use.

4. By commencing any activity related to the project or using any structure authorized by this permit, Developer accepts all of the conditions and obligations imposed by this permit and waives any challenge to the validity of the conditions and obligations stated therein.

5. Developer agrees, as a condition of adoption of this resolution, at Developer's own expense, to indemnify, defend and hold harmless the City and its agents, officers and employees from and against any claim, action or proceeding to attack, review, set aside, void or annul the approval of the resolution or any condition attached thereto or any proceedings, acts or determinations taken, done or made prior to the approval of such resolution that were part of the approval process. Developer's commencement of construction or operations pursuant to the resolution shall be deemed to be an acceptance of all conditions thereof.

6. Developer shall obtain a building permit for any new construction or modifications to structures, including interior modifications, authorized by this permit.

7. If Developer, owner or tenant fails to comply with any of the conditions of this permit, the Developer, owner or tenant shall be subject to a civil fine pursuant to the City Code.

8. Prior to issuance of building permits, Developer shall correct all violations of the City Code existing on the project property.

9. Prior to issuance of building permits, Developer shall sign a letter agreeing to the conditions of approval within this resolution.

## PLANNING STANDARD CONDITIONS

10. The final building plans submitted by the Developer with the building permit application shall depict all building materials and colors to be used in construction.

11. Before the City issues building permits, Developer shall include a reproduction of all conditions of this permit as adopted by resolution of the Planning Commission and/or the City Council in all sets of construction documents and specifications for the project.

12. Developer shall provide for dust control at all times during project property preparation and construction activities.

13. Developer shall not store construction materials or vehicles outdoors on the project property.

Resolution No.
Page 4 of 5

14. It is hereby declared to be the intent that if any provision of this permit is held or declared invalid, the permit shall be void and the privileges granted hereunder shall lapse.

15. It is further declared and made a condition of this permit that if any condition of this permit is violated, or if any law, statute or ordinance is violated, the permit shall be suspended and the privileges granted hereunder shall lapse. The applicant shall have been written notice to cease such violations and has failed to comply for a period of thirty (30) days.

16. That the Planning Commission may review this approval upon notice of violation by the Code Enforcement Officer.

17. That final inspection shall not be granted until all conditions of approval have been met and verified by staff.

18. That this approval is for the construction of a 14,320 square foot religious facility, a caretakers unit, and a stand alone parking lot as detailed in Conditional Use Permit No. 263. This approval is contingent upon compliance with all conditions in CUP No. 263 and SP 1120.

19. That this approval permits a variance from the height requirements allowing a maximum height of 35'6" for the minaret architectural feature only.

20. The minaret shall not have any habitable space, sound devices, or lights within the structure.

21. This permit is granted subject to the approval of General Plan Amendment No. 2008-03, Zone Change No. 110, and Zone Text Amendment No. 2008-07 for the project property.

Resolution No.
Page 5 of 5

PASSED and ADOPTED by the Planning Commission of the City of Lomita on this 14th day of September, 2009 by the following vote:

AYES:      Commissioners:

NOES:      Commissioners:

ABSENT:  Commissioners:


_____
Augustine Hermenegildo, Chair


ATTEST: _____
Gary Y. Sugano
Community Development Director


Within fifteen (15) days of the date of this decision for an exception, permit, change of zone, or other approval, or by the person the revocation of whose permit, exception, change of zone, or other approval is under consideration, of notice of the action of, or failure to act by, the Commission, any person dissatisfied with the action of, or the failure to act by, the Commission may file with the City Clerk an appeal from such action upon depositing with said Clerk an amount specified by resolution of the City Council.

Any action to challenge the final decision of the City made as a result of the public hearing on this application must be filed within the time limits set forth in Code of Civil Procedure Section 1094.6.


\\Athena\D\Shared\Community Development\Planning\Alicia\Islamic Center\_PC_Resolution ZV.doc

Complaint

Exh. H

RESOLUTION NO.

A RESOLUTION OF THE PLANNING COMMISSION OF THE CITY OF LOMITA RECOMMENDING CITY COUNCIL APPROVAL OF SITE PLAN REVIEW NO. 1120 TO ALLOW A SIDE YARD SETBACK OF 3 FEET INSTEAD OF THE CODE REQUIRED 20 FEET AND TO PERMIT A REAR YARD SETBACK OF 7 FEET INSTEAD OF THE CODE REQUIRED 20 FEET FOR THE PROPERTIES LOCATED AT 25816 WALNUT STREET, 25829 -1/4, 25833, 25833-1/2 APPIAN WAY, AND APN NO. 7553-010-032. INITIATED AND FILED BY SHAKIL PATEL OF 25982 HINKLEY ST. LOMA LINDA, CA 92354.

Section 1. Recitals

A.  The Planning Commission of the City of Lomita has considered an application for a General Plan Amendment No. 2008-03, Zone Change No. 110, Zone Text Amendment No. 2008-07, Conditional Use Permit No. 263, Site Plan Review No. 1120, and Zone Variance No. 216, an amendment to the City of Lomita General Plan Land Use Map from Commercial to Low Density Residential and an amendment to the City's Zoning Map from C-R, Commercial Retail, to R-1, Single Family Residential for the properties located at 25816 Walnut Street and 25829 ¼ Appian Way; a request for a zone text amendment amending Section 11-1.48.02 of the Lomita Zoning Code to allow "parking lots and parking buildings" as a conditionally permitted use in the C-R (Commercial, Retail) Zone; a conditional use permit to allow a 14,320 square foot religious facility and a 1,470 square foot priest/caretakers unit within the R-1, Single Family Residential Zone, and a stand alone parking lot within the CR, Commercial Retail Zone; a site plan review to permit a side yard setback of 3' instead of the code required 20' and to permit a rear yard setback of 7' instead of the code required 20', and; a request for a variance from Section 11-1.32.06(D)(1) of the Zoning Ordinance to allow building height of 35'6" instead of the code allowed maximum height of 27' for the properties at 25816 Walnut Street, 25829 -1/4, 25833, 25833-1/2 Appian Way, and APN No. 7553-010-032. Initiated and filed by Shakil Patel of 25982 Hinkley St. Loma Linda, CA 92354.

B.  Pursuant to Section 15070 of the California Code of Regulations an initial study was prepared and a determination has been made that there is no substantial evidence that the proposed amendment may have a significant effect on the environment, and accordingly a Negative Declaration was prepared and posted for public review.

C.  On June 8, 2009, the Planning Commission held a duly noticed public hearing and accepted public testimony; where the item was continued off-calendar.

D.  On September 14, 2009 the Planning Commission held a duly noticed public hearing and accepted additional testimony on the application.

E.  The Planning Commission cannot approve any administrative applications that are not consistent with the zoning ordinance and General Plan as it currently exists. Because the applications for the site plan review, the variance and the CUP are dependent on enactment of the proposed legislative changes, the Planning Commission will make a recommendation to the City Council with respect to these administrative applications, consistent with its recommendation on the legislative applications, and the City Council will consider the Planning Commission's recommendations and the applications all together.

Resolution No.
Page 2 of 5

F.    Since General Plan Amendment No. 2008-03, Zone Change No. 110, Zone Text Amendment No. 2008-07 have not been adopted by the City Council at the time of this hearing, the findings set forth by the Planning Commission are hypothetical and reflect the recommendation of the Planning Commission should the General Plan, Zoning Map and Zoning Text be amended in the manner requested by the applicant. This resolution also contains proposed conditions that the Planning Commission recommends for inclusion in the final decision on this permit.

Section 2. Pursuant to Article 75 of the Lomita Municipal Code, the Planning Commission of the City of Lomita finds, after due study and deliberation that the following circumstances will exist upon adoption of General Plan Amendment No. 2008-03, Zone Change No. 110, Zone Text Amendment No. 2008-07:

1)    *Suitability of the site for the particular use or development intended, and the total development, including the application of prescribed development standards, shall be so arranged as to avoid traffic congestion, insure the protection of public health, safety and general welfare, prevent adverse effects on neighboring property and shall be in general accord with all elements of the general plan; and*

2)    *Suitable and functional development design, but it is not intended that such approval be interpreted to require a particular type of architecture; and*

3)    *Topographic features, subdivision plans, or other conditions create an unnecessary hardship or unreasonable regulation or make it obviously impractical to require compliance with the yard requirements or setback line.*

The site is suitable for the facility and is so arranged to avoid traffic congestions and prevent adverse impacts on the neighborhood  The design is suitable and functional because the site exceeds the lot width and size requirements and the project is proposing a six foot perimeter block wall and required landscaping. The project is providing additional parking in excess of the Code requirement and as determined by the traffic study and occupant load projections.  The project will be consistent with the residential requirements by providing a six foot block wall along the entire property line and primarily keeping the height of the building at 27'.

Yard setback requirements are intended to maintain a separation between structures and help mitigate any impacts between adjacent residential properties. Under normal circumstances there would only be a five foot setback requirement. In this particular case, the height of the architectural minaret is increasing the setback requirement to 20'. The minaret proposed for the religious facility is a unique architectural feature of mosques. The project has the 20' required side yard setback adjacent to the more sensitive residential uses and is only requesting the modification adjacent to commercial uses. The long, narrow, and odd shape of the project site makes it impractical to require two- 20 foot side yard set backs and creates an unnecessary hardship on the applicant. The modification is required to accommodate the architecture of the proposed religious facility, which is reasonable and does not amount to a special privilege, and still maintains the privacy separation between structures.  The rear yard setback varies from 7'-15' due to the unusual angle of the rear property line. This constitutes a unique feature of the property which creates further unnecessary hardship for the applicant. Furthermore, the neighborhood residents have stated that they prefer having the residential unit facing Appian

Resolution No.
Page 3 of 5

        Way over the previously proposed parking lot which met the rear yard setback requirements.

Section 3.  The Planning Commission of the City of Lomita hereby recommends City Council approval of Site Plan Review No. 1120 and the negative declaration subject to the attached proposed conditions.

## GENERAL PROJECT CONDITIONS

1.    This permit is granted for the property described in the application on file with the Planning Division, and may not be transferred from one property to another.

2.    This permit is granted for the plans dated September 8th, 2009 ("the plans") on file with the Planning Division. The project shall conform to the plans, except as otherwise specified in these conditions, or unless a minor modification to the plans is approved by the Community Development Director. A minor modification (up to 10%) may be granted for minimal changes or increases in the extent of use or size of structures or of the design, materials or colors of structures or masonry walls. Any application for a minor modification to the project shall be accompanied by three copies of plans reflecting the requested modification, together with applicable processing fees.

3.    This permit shall automatically become null and void 12 months from the date of its issuance, unless Developer has diligently developed the proposed project, as shown by the issuance of a grading, foundation, or building permit and the construction of substantial improvements, or the beginning of the proposed use.

4.    By commencing any activity related to the project or using any structure authorized by this permit, Developer accepts all of the conditions and obligations imposed by this permit and waives any challenge to the validity of the conditions and obligations stated therein.

5.    Developer agrees, as a condition of adoption of this resolution, at Developer's own expense, to indemnify, defend and hold harmless the City and its agents, officers and employees from and against any claim, action or proceeding to attack, review, set aside, void or annul the approval of the resolution or any condition attached thereto or any proceedings, acts or determinations taken, done or made prior to the approval of such resolution that were part of the approval process. Developer's commencement of construction or operations pursuant to the resolution shall be deemed to be an acceptance of all conditions thereof.

6.    Developer shall obtain a building permit for any new construction or modifications to structures, including interior modifications, authorized by this permit.

7.    If Developer, owner or tenant fails to comply with any of the conditions of this permit, the Developer, owner or tenant shall be subject to a civil fine pursuant to the City Code.

8.    Prior to issuance of building permits, Developer shall correct all violations of the City Code existing on the project property.

9.    Prior to issuance of building permits, Developer shall sign a letter agreeing to the conditions of approval within this resolution.

Resolution No.
Page 4 of 5

## PLANNING STANDARD CONDITIONS

10.  The final building plans submitted by the Developer with the building permit application shall depict all building materials and colors to be used in construction.

11.  Before the City issues building permits, Developer shall include a reproduction of all conditions of this permit as adopted by resolution of the Planning Commission and/or the City Council in all sets of construction documents and specifications for the project.

12.  Developer shall provide for dust control at all times during project property preparation and construction activities.

13.  Developer shall not store construction materials or vehicles outdoors on the project property.

14.  It is hereby declared to be the intent that if any provision of this permit is held or declared invalid, the permit shall be void and the privileges granted hereunder shall lapse.

15.  It is further declared and made a condition of this permit that if any condition of this permit is violated, or if any law, statute or ordinance is violated, the permit shall be suspended and the privileges granted hereunder shall lapse. The applicant shall have been written notice to cease such violations and has failed to comply for a period of thirty (30) days.

16.  That the Planning Commission may review this approval upon notice of violation by the Code Enforcement Officer.

17.  That final inspection shall not be granted until all conditions of approval have been met and verified by staff.

18.  That this approval is for the construction of a 14,320 square foot religious facility, a 1,470 square foot priest/caretakers unit, and a stand alone parking lot as detailed in Conditional Use Permit No. 263. This approval is contingent upon compliance with the conditions in CUP No. 263 and ZV No. 216.

19.  That this approval allows a side yard setback of 3' instead of the code required 20' and a rear yard setback of 7' instead of the code required 20'.

20.  A six foot block wall is required along the southern property lines.

21.  That, in the event of a disagreement in the interpretation and/or application of these conditions, the issue shall be referred back to the Planning Commission for a decision prior to the issuance of a building permit.

22.  This permit is granted subject to the approval of General Plan Amendment No. 2008-03, Zone Change No. 110, and Zone Text Amendment No. 2008-07 for the project property.

Resolution No.
Page 5 of 5

PASSED and ADOPTED by the Planning Commission of the City of Lomita on this 14th day of
September, 2009 by the following vote:

AYES:      Commissioners:

NOES:      Commissioners:

ABSENT:  Commissioners:

_____
Augustine Hermenegildo, Chair

ATTEST: _____
Gary Y. Sugano
Community Development Director

Within fifteen (15) days of the date of this decision for an exception, permit, change of zone, or other
approval, or by the person the revocation of whose permit, exception, change of zone, or other
approval is under consideration, of notice of the action of, or failure to act by, the Commission, any
person dissatisfied with the action of, or the failure to act by, the Commission may file with the City
Clerk an appeal from such action upon depositing with said Clerk an amount specified by resolution of
the City Council.

Any action to challenge the final decision of the City made as a result of the public hearing on this
application must be filed within the time limits set forth in Code of Civil Procedure Section 1094.6.

\\Athena\D\Shared\Community Development\Planning\Alicia\Islamic Center\_PC_Resolution SP.doc

Complaint

Exh. I

RESOLUTION NO.

A RESOLUTION OF THE PLANNING COMMISSION OF THE CITY OF LOMITA RECOMMENDING CITY COUNCIL APPROVAL OF CONDITIONAL USE PERMIT NO. 263 TO ALLOW A 14,320 SQUARE FOOT RELIGIOUS FACILITY AND A 1,470 SQUARE FOOT PRIEST/CARETAKERS UNIT WITHIN THE R-1, SINGLE FAMILY RESIDENTIAL ZONE, AND A STAND ALONE PARKING LOT WITHIN THE CR, COMMERCIAL RETAIL ZONE FOR THE PROPERTIES LOCATED AT 25816 WALNUT STREET, 25829 -1/4, 25833, 25833-1/2 APPIAN WAY, AND APN NO. 7553-010-032. INITIATED AND FILED BY SHAKIL PATEL OF 25982 HINKLEY ST. LOMA LINDA, CA 92354.

Section 1. Recitals

A.   The Planning Commission of the City of Lomita has considered an application for a General Plan Amendment No. 2008-03, Zone Change No. 110, Zone Text Amendment No. 2008-07, Conditional Use Permit No. 263, Site Plan Review No. 1120, and Zone Variance No. 216, an amendment to the City of Lomita General Plan Land Use Map from Commercial to Low Density Residential and an amendment to the City's Zoning Map from C-R, Commercial Retail, to R-1, Single Family Residential for the properties located at 25816 Walnut Street and 25829 ¼ Appian Way; a request for a zone text amendment amending Section 11-1.48.02 of the Lomita Zoning Code to allow "parking lots and parking buildings" as a conditionally permitted use in the C-R (Commercial, Retail) Zone; a conditional use permit to allow a 14,320 square foot religious facility and a 1,470 square foot priest/caretakers unit within the R-1, Single Family Residential Zone, and a stand alone parking lot within the CR, Commercial Retail Zone; a site plan review to permit a side yard setback of 3' instead of the code required 20' and to permit a rear yard setback of 7' instead of the code required 20', and; a request for a variance from Section 11-1.32.06(D)(1) of the Zoning Ordinance to allow building height of 35'6" instead of the code allowed maximum height of 27' for the properties at 25816 Walnut Street, 25829 -1/4, 25833, 25833-1/2 Appian Way, and APN No. 7553-010-032. Initiated and filed by Shakil Patel of 25982 Hinkley St. Loma Linda, CA 92354.

B.   Pursuant to Section 15070 of the California Code of Regulations an initial study was prepared and a determination has been made that there is no substantial evidence that the proposed amendment may have a significant effect on the environment, and accordingly a Negative Declaration was prepared and posted for public review.

C.   On June 8, 2009, the Planning Commission held a duly noticed public hearing and accepted public testimony; where the item was continued off-calendar.

D.   On September 14, 2009 the Planning Commission held a duly noticed public hearing and accepted additional testimony.

E.   The Planning Commission cannot approve any administrative applications that are not consistent with the zoning ordinance and General Plan as it currently exists.  Because the applications for the site plan review, the variance and the CUP are dependent on enactment of the proposed legislative changes, the Planning Commission will make a recommendation to the City Council with respect to these administrative applications, consistent with its recommendation on the

Resolution No.
Page 2 of 8

legislative applications, and the City Council will consider the Planning Commission's recommendations and the applications all together.

F.   Since General Plan Amendment No. 2008-03, Zone Change No. 110, Zone Text Amendment No. 2008-07 have not been adopted by the City Council at the time of this hearing, the findings set forth by the Planning Commission are hypothetical and reflect the recommendation of the Planning Commission should the General Plan, Zoning Map and Zoning Text be amended in the manner requested by the applicant. This resolution also contains proposed conditions that the Planning Commission recommends for inclusion in the final decision on this permit.

Section 2. Pursuant to Article 72 of the Lomita Municipal Code, the Planning Commission of the City of Lomita finds, after due study and deliberation that the following circumstances will exist upon adoption of General Plan Amendment No. 2008-03, Zone Change No. 110, Zone Text Amendment No. 2008-07:

1)   *The proposed conditional use shall not be in substantial conflict with the general plan for the area.*

Should the General Plan Amendment be approved, the land use designation for the project area that will accommodate the facility will be Low Density Residential and the proposed parking lot will be under a commercial designation. The Residential land use designation "applies to areas of the City which are developed with single family residential uses." Religious facilities are a conditionally permitted use within the corresponding Single Family Residential zoning distric, and are a compatible ancillary use within residential neighborhoods. The Commercial land use designation applies to the commercial corridors in Lomita including those located along Pacific Coast Highway, Lomita Boulevard, Western Avenue and the northern end of Narbonne Avenue. The parking lot is consistent because parking facilities are a necessary ancillary use for a commercial property.

2)   *The nature, condition and development of adjacent uses, buildings and structures shall be considered and no proposed conditional use shall be permitted where such use will adversely affect or be materially detrimental to said adjacent uses, buildings and structures.*

The uses adjacent to the north of the facility are commercial retail and will not be impacted by the new structure. The uses to the south are residential and with all of the requested project approvals the project will be consistent with the residential requirements by providing a six foot block wall along the entire property line and primarily keeping the height of the building at 27'. The project is required to have a site plan review for a side yard setback modification due to the height of the minaret, a unique architectural feature of mosques, and not due to the useable area of the building itself. Furthermore, the applicant has reduced the height of the minaret by five feet to 35'6". The project is conditioned to require that all organized events be conducted inside the building, except for those that receive special event permit approval in accordance with Title III, Chapter 6.5 of the Lomita Municipal Code.

The applicant has reduced the size of the project and relocated the priest/caretakers residence from the Islamic Center and is now proposing a residential unit with a craftsman style design fronting along Appian Way. This unit will help to further integrate the project into the neighborhood by maintaining the residential frontage along the street.

Resolution No.
Page 3 of 8

Additionally, the project is providing 31 more parking spaces than what they currently provide and in excess of what the Code requires. This will allow for more vehicles to park on-site and alleviate on-street parking congestion within that neighborhood.

Included in this conditional use permit is the parking lot located within the C-R, Commercial Retail zone. The parking lot is located between two retail buildings which have their own parking accommodations. The width and parking stall dimensions meet requirements and will not impact the adjacent uses. This parking lot should be sufficient to accommodate the parking demand of the facility.

3)   *The site for a proposed conditional use shall be adequate in size and shape to accommodate the yards, walls, fences, parking and loading facilities, landscaping and other development features prescribed in the Zoning Ordinance, or as required as a condition in order to integrate said use with the uses in the neighborhood.*

The site is adequate in size and shape to accommodate the various aspects of the project while integrating the use into the respective commercial and residential portions of the neighborhood. As designed, the project provides parking in the commercially zoned portion of the project site and provides the religious facility and caretaker/priest's residential unit facing Appian Way, a residential street. Religious facilities have special development standards outlined within the Zoning Ordinance. The site exceeds the lot width and size requirements and is proposing a six foot perimeter block wall and required landscaping. The project is providing additional parking in excess of the Code requirement and as determined by the traffic study and occupant load projections.  The project will be consistent with the residential requirements by providing a six foot block wall along the entire property line and primarily keeping the height of the building at 27'. The increased height is only associated with the minaret and the building adjacent to the residential uses will not be higher than 27'.   The project is requesting a variance due to the height of the minaret only, a side yard setback modification for the north property line, and a rear yard setback modification for the residential unit facing Appian Way. Although the project requires a variance for height, it is only for the architectural minaret and not for the overall size of the structure. There is no habitable space within the minaret nor will it have any noise making devices which would disrupt the neighborhood.

The parking lot within the CR zone also meets all development requirements and will provide additional parking in excess of the Code requirement.

<u>Section 3.</u> The Planning Commission of the City of Lomita hereby recommends City Council approval Conditional Use Permit No. 263 subject to the attached proposed conditions.

## GENERAL PROJECT CONDITIONS

1.   This permit is granted for the property described in the application on file with the Planning Division, and may not be transferred from one property to another.

2.   This permit is granted for the plans dated September 8, 2009 ("the plans") on file with the Planning Division.  The project shall conform to the plans, except as otherwise specified in these

Resolution No.
Page 4 of 8

conditions, or unless a minor modification to the plans is approved by the Community Development Director. A minor modification (up to 10%) may be granted for minimal changes or increases in the extent of use or size of structures or of the design, materials or colors of structures or masonry walls. Any application for a minor modification to the project shall be accompanied by three copies of plans reflecting the requested modification, together with applicable processing fees.

3.  This permit shall automatically become null and void 12 months from the date of its issuance, unless Developer has diligently developed the proposed project, as shown by the issuance of a grading, foundation, or building permit and the construction of substantial improvements, or the beginning of the proposed use.

4.  By commencing any activity related to the project or using any structure authorized by this permit, Developer accepts all of the conditions and obligations imposed by this permit and waives any challenge to the validity of the conditions and obligations stated therein.

5.  Developer agrees, as a condition of adoption of this resolution, at Developer's own expense, to indemnify, defend and hold harmless the City and its agents, officers and employees from and against any claim, action or proceeding to attack, review, set aside, void or annul the approval of the resolution or any condition attached thereto or any proceedings, acts or determinations taken, done or made prior to the approval of such resolution that were part of the approval process. Developer's commencement of construction or operations pursuant to the resolution shall be deemed to be an acceptance of all conditions thereof.

6.  Developer shall obtain a building permit for any new construction or modifications to structures, including interior modifications, authorized by this permit.

7.  If Developer, owner or tenant fails to comply with any of the conditions of this permit, the Developer, owner or tenant shall be subject to a civil fine pursuant to the City Code.

8.  Prior to issuance of building permits, Developer shall correct all violations of the City Code existing on the project property.

9.  Prior to issuance of building permits, Developer shall sign a letter agreeing to the conditions of approval within this resolution.

**PLANNING STANDARD CONDITIONS**

10. The final building plans submitted by the Developer with the building permit application shall depict all building materials and colors to be used in construction.

11. Before the City issues building permits, Developer shall include a reproduction of all conditions of this permit as adopted by resolution of the Planning Commission and/or the City Council in all sets of construction documents and specifications for the project.

12. Developer shall provide for dust control at all times during project property preparation and construction activities.

Resolution No.
Page 5 of 8

13.  Developer shall not store construction materials or vehicles outdoors on the project property.

14.  It is hereby declared to be the intent that if any provision of this permit is held or declared invalid, the permit shall be void and the privileges granted hereunder shall lapse.

15.  It is further declared and made a condition of this permit that if any condition of this permit is violated, or if any law, statute or ordinance is violated, the permit shall be suspended and the privileges granted hereunder shall lapse. The applicant shall have been written notice to cease such violations and has failed to comply for a period of thirty (30) days.

16.  That the Planning Commission may review this approval upon notice of violation by the Code Enforcement Officer.

17.  That final inspection shall not be granted until all conditions of approval have been met and verified by staff.

18.  That this approval is for the construction of a 14,320 square foot religious facility, a 1,470 square foot priest/caretakers unit, and a stand alone parking lot.

19.  That this approval permits a modification from the required side yard setback requirement of 26' allowing a side yard setback of 3' and a rear yard setback of 7'. This approval also permits a variance from the height requirements allowing a maximum height of 35'6" for the minaret feature only.

20.  A six foot block wall is required along the southern property lines.

21.  That, in the event of a disagreement in the interpretation and/or application of these conditions, the issue shall be referred back to the Planning Commission for a decision prior to the issuance of a building permit.

22.  For any exterior utility meter panels, Developer shall paint such panels to match the structure upon which it is located.  Such panels shall be located to take advantage of screening (e.g. landscaping or other building elements) from public right-of-ways, to the maximum extent feasible.

23.  Project on-site lighting shall be of a type and in a location that does not constitute a hazard to vehicular traffic, either on private property or on adjoining streets.  To prevent damage from vehicles, standards in parking areas shall be mounted on reinforced concrete pedestals or otherwise protected.  Developer shall recess or conceal under-canopy lighting elements so as not to be directly visible from a public street.  Developer shall submit a lighting plan showing standard heights and light materials for design review and approval of the Community Development Director.

24.  In order to minimize light and glare on the project property, all parking lot and exterior structure light fixtures shall be high cut-off type that divert lighting downward onto the property and shall not cast light on any adjacent property or roadway.

25.  This permit is granted subject to the approval of General Plan Amendment No. 2008-03, Zone

Resolution No.
Page 6 of 8

Change No. 110, and Zone Text Amendment No. 2008-07 for the project property.

26. The applicant shall remove the proposed covered walkway attached to the new facility along the north and south elevations.

## LANDSCAPING STANDARD CONDITIONS

27. Before the City issues building permits or the proposed use is initiated, Developer shall submit two copies of landscape and irrigation plans, along with the appropriate permit application and fees, to the Planning Division and obtain approval of such plans.

28. Before the City issues a certificate of occupancy, Developer shall install landscape and automatic irrigation systems. The irrigation shall be weather based and of the smart irrigation type. It shall be a brand approved by the Irrigation Association of California State University Fresno. A list of systems may be obtained from the planning department.

29. Developer shall maintain landscape planting and all irrigation systems as required by the City Code and as specified by this permit.  Failure of Developer to do so will result in the revocation of this permit and initiation of legal proceedings against Developer.

30. All trees planted or placed on the project property by Developer shall be at least 24-inch-box size.  All shrubs and vines shall be at least five-gallon size, except as otherwise specified by this permit.

31. The project shall meet the maximum allowable water usage requirements as calculated by the AB 325 formula. The calculations shall be shown on the submitted landscape plans for verification.

32. Sprinkler heads must rotate and be designed with a 70% distribution uniformity in turf areas and 80% in non turf areas.

33. Run off directional flow shall be detailed on the landscape plan with as much run-off water captured in landscaped areas as possible.

34. Turf and non-turf areas shall be installed on individual valves of the irrigation system.

## FIRE DEPARTMENT STANDARD CONDITIONS

35. Developer shall construct all vehicle access driveways on the project property to be at least 25 feet wide.  Developer shall mark curbs adjacent to designated fire lanes in parking lots to prohibit stopping and parking in the fire lanes.  Developer shall mark all designated fire lanes in accordance with the California Vehicle Code.

36. All roof covering materials on the project property shall be of non-combustible or fire retardant materials approved by the Los Angeles County Fire Department.

37. Before the City issues building permits, Developer shall obtain the Los Angeles County Fire Department approval of a plan to ensure fire equipment access and the availability of water for fire combat operations to all areas of the project property.  The Los Angeles County Fire

Department shall determine whether or not the plan provides adequate fire protection.

38. At Developer's expense and if required by the Los Angeles County Fire Department, Developer shall obtain two certified fire flow tests for the project property. The first test shall be completed before City approval of building plans and the second shall be completed after construction and prior to the issuance of a certificate of occupancy. The tests must be certified by a mechanical, civil, or fire protection engineer. Developer shall obtain permits for the tests from the Engineering Division. Developer shall send the results of the tests to the Los Angeles County Fire Department and the City Engineer.

39. At all times during construction, Developer shall maintain all-weather surfaces that provide access for fire fighting apparatus to all parts of the project property.

40. Developer shall identify all hydrants and fire protection equipment on the project property as required by the Los Angeles County Fire Department.

41. Developer shall install security devices and measures, including walkway and vehicle control gates, entrance telephones, intercoms and similar features, subject to approval of the Los Angeles County Sheriff's Department and the Los Angeles County Fire Department.

42. Developer shall provide central station monitoring of the fire sprinkler system and all control valves.

43. Developer shall provide automatic fire sprinklers as required by the City Code and shall contact the Los Angeles County Fire Department to ascertain the location of all connections.

44. Developer shall install in each structure in the project an alarm system with a central station monitor that will automatically notify the Fire Department in the event of a fire in the structure. The alarm system shall include a UL or State Fire Marshal approved device, which shall not exceed design specifications, that reports the location of the fire and allows the central station monitor to inform the Fire Department of the point of entry into the structure that is nearest the fire.

45. Developer shall comply with Los Angeles County Fire Department requirements regarding storage, handling and generation of hazardous materials or waste. Prior to the issuance of building permits, Developer shall contact the Los Angeles County Fire Department to ensure that such requirements are followed.

46. Developer shall install a carbon monoxide detector at the location of the residential unit in accordance with the manufacturer's specifications. Such detector shall be hardwired with a battery backup.

47. Developer shall pay Quimby Fees and Parkway Tree Fees before issuance of building permits. The amount of the fee shall be determined by the Planning Division at the time of payment.

48. Developer shall pay the Development Tax of $1,000 per residential unit prior to issuance of building permits.

Resolution No.
Page 8 of 8

49. Developer shall pay the applicable Water Facilities fee, currently 1 ½ % of the valuation of the development.

50. The maximum occupancy of the area designated on the plans as the prayer area shall be 210 persons.

51. The project shall provide a gate restricting pedestrian accesses from Appian Way to inside the Center. The gate shall be located along the north side of the caretakers/priest unit.

52. All organized events shall be conducted inside the building unless otherwise approved through the special events permit process in Title III, Chapter 6.5, or other applicable section, of the Lomita Municipal Code beforehand.

PASSED and ADOPTED by the Planning Commission of the City of Lomita on this 14th day of September, 2009 by the following vote:

AYES:     Commissioners:

NOES:     Commissioners:

ABSENT:  Commissioners:


_____
Augustine Hermenegildo, Chair


ATTEST: _____
            Gary Y. Sugano
            Community Development Director

Within fifteen (15) days of the date of this decision for an exception, permit, change of zone, or other approval, or by the person the revocation of whose permit, exception, change of zone, or other approval is under consideration, of notice of the action of, or failure to act by, the Commission, any person dissatisfied with the action of, or the failure to act by, the Commission may file with the City Clerk an appeal from such action upon depositing with said Clerk an amount specified by resolution of the City Council.

Any action to challenge the final decision of the City made as a result of the public hearing on this application must be filed within the time limits set forth in Code of Civil Procedure Section 1094.6.

\\Athena\D\Shared\Community Development\Planning\Alicia\Islamic Center\_PC_Resolution CUP.doc

Complaint

# Exh. J

# ATTENTION LOMITA CITIZENS!!

On September 14, the Lomita City Planning Commission decided by a majority vote to recommend to the City Council to approve the proposed building project of the Islamic Center pictured below located at 25616 Walnut Avenue.   In order for this project to be built, the applicants are asking for:

- General Plan amendment
- City's Zone Map change
- Site plan review and modification to required setbacks and Zone variances
- The city would permanently lose tax money if the zone is changed from Commercial to Residential
- Conditional Use Permit
- Zone Text Amendment

**We oppose the above changes and believe the impact, size and architectural design of this building doesn't fit into our community.  We need a large number of PETITION SIGNATURES and PEOPLE AT THE MEETING.** United together, we can inform more neighbors by having them sign the petition, coming to the City Council meeting and signing-up on the email address below -- your help is greatly needed.  To help, just contact us at the email below & we will email you a Petition form, Email Sign-up form and a flyer.

**THE CITY COUNCIL HAS THE AUTHORITY TO APPROVE OR OPPOSE THIS BUILDING PROJECT THAT WILL BE ON THE AGENDA FOR THE MONDAY, DECEMBER 7TH MEETING AT 7:00 PM!**



### PROPOSED BUILDING PROJECT
(south of PCH, between Walnut and Appian Way -- behind Twins Bike Shop, Dominos Pizza &  the 7 -- 11 Store)

WE NEED YOUR EMAIL ADDRESS to be able to quickly communicate information about issues of concern both now and in the future to Lomita residents.  If you would like to unite together as Lomita citizens and have a greater voice in our city, then please contact us at **LomitaCitizens@gmail.com**

**COME TO THE CITY COUNCIL MEETING ON MONDAY, DECEMBER 7TH AT 7:00 P.M. -- WE NEED MANY RESIDENTS TO COME EARLY & STAY THE WHOLE MEETING SHOWING THEIR OPPOSITION TO THIS PROJECT.**

THANK YOU!!!

# Attention Lomita Citizens

<u>On Monday, March 1, 2010, the City Council of Lomita</u> will be voting on the proposed building project submitted by the Islamic Center located at 25616 Walnut Avenue (south of PCH, between Walnut and Appian Way - behind Dominos Pizza & 7 -11 Store). In order for this project to be built, the applicant is asking for many changes to the Lomita's Municipal Code and General Plan.

We strongly oppose this project and its impact on our community for the following reasons:

- changing Commercial-Retail zone to Residential-1 (this would apply to over *lh* of their property); if this gets changed, Lomita would permanently lose tax money, which ultimately affects the city's budget & citizens.
- the negative impact this development has and will have relating to parking & public safety; this is a major problem now and will become a bigger problem even with additional new parking spaces.
- the present and future increase in vehicular traffic on adjacent streets and surrounding area; currently, it is a

problem and will only increase with a larger facility.

- the proposed height of the new structure - 27 feet high, 117 feet long building with a 3S foot minaret
- the building size and scope does not fit in with this residential area
- the inadequate setbacks from adjacent properties and Appian Way (should be 20 ft. - they have 3 ' on N; 7' & IS'onE)
- any change requested to the General Plan or the Municipal Code of the City of Lomita

Because of these issues and because they could set precedence for future building projects, we are requesting that this project be denied by the City Council.

## WE NEED a large number of citizens to come to the CITY COUNCIL MEETING ON MON., MARCH 1 - our number shows our concern

Come early at 6:00 p.m. if you want to get a seat, but the meeting starts at 7:00 p.m. Come & stay for the whole meeting and voice your opinion. For example: "We oppose this building project and oppose changing the Commercial-Retail (C-R) to Residential (R); we oppose the impact this project with have on the neighborhood and our community." The C-R to R is the KEY point that needs to be made clearly.

IMPORTANT: Since the Islamic Center could take this off the Agenda at any time before March 1 (like they did in Dec.), please check their status with the City Hall or *http://www.lomita.com/cityhall/* or our website at www.LomitaCitizens.org or em ail us at LomitaCitizens@gmail.com on March 1.

<u>WE NEED PEOPLE TO SIGN THE PETITION AND TO GET OTHER SIGNATURES</u> - contact us at our email below for a copy and return it to us by this weekend.

<u>WE NEED YOUR EMAIL (or PHONE NUMBER if you don't have email):</u>

When any proposal or project comes up at City Hall, they only have to notify people within 300 feet of the project with a lO-day notice. Or if an item is placed on the Planning Commission Agenda or the City Council Agenda, the public only gets a 5-day notice IF you go to City Hall on Thursday before the Monday meeting and pick up their Agenda. If a BIG project concerning to our citizens comes up, it is IMPOSSIBLE to get the word out to a large number of our citizens in 5 to 7 days by going door-to-door, which is our only option for communicating with our community.

The solution is to get an em ail base of our Lomita Citizens so we can quickly communicate information and issues of concern to Lomita residents as the come up. If you would like to unite together as Lomita citizens and have a greater voice in our city, then send you email tousatLomitaCitizens@gmail.com . We will only email priority concerns so emails will be minimal, your info will be kept confidential and you can request you email to be removed at any time. If you have any questions, contact us.

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

**NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY**

This case has been assigned to District Judge John Kronstadt and the assigned discovery Magistrate Judge is Fernando M. Olguin.

The case number on all documents filed with the Court should read as follows:

## CV12- 2418 JAK (FMOx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

==================================================

**NOTICE TO COUNSEL**

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

**[X]  Western Division**
312 N. Spring St., Rm. G-8
Los Angeles, CA 90012

**[ ]  Southern Division**
411 West Fourth St., Rm. 1-053
Santa Ana, CA 92701-4516

**[ ]  Eastern Division**
3470 Twelfth St., Rm. 134
Riverside, CA 92501

Failure to file at the proper location will result in your documents being returned to you.

ORIGINAL

Name & Address:
Anne Richardson (# 151541)/Reem Salahi (#259711)
Hadsell Stormer Keeny Richardson & Renick, LLP
128 N. Fair Oaks Avenue,  Pasadena, CA  91103
Tel: (626) 585-9600/Fax:  (626) 577-7079
arichardson@hskrr.com/reem@hskrr.com

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ISLAMIC CENTER OF THE SOUTH BAY, LOS ANGELES<br><br>PLAINTIFF(S)<br><br>v.<br><br>CITY OF LOMITA, et al.,<br>(see Attachment A)<br><br>DEFENDANT(S). | CASE NUMBER<br><br>CV12-2418-JAK (FMOx)<br><br><br>SUMMONS |

TO:   DEFENDANT(S): <u>CITY OF LOMITA, et al., (see Attachment A)</u>

A lawsuit has been filed against you.

    Within ___21___ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff's attorney, <u>Anne Richardson</u>, whose address is <u>HadsellStormerKeenyRichardsonRenick 128 N. Fair Oaks Ave., Pasadena CA 91103</u>.  If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint.  You also must file your answer or motion with the court.

Dated: ___MAR 2 1 2012___

Clerk, U.S. District Court

By: _____
          Deputy Clerk

*(Seal of the Court)*

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States.  Allowed 60 days by Rule 12(a)(3)].*

---

CV-01A (12/07)            **SUMMONS**

# ATTACHMENT A

to Summons in
Islamic Center of the South Bay, Los Angeles v. City of Lomita, et al.

**Total Named defendants:**

CITY OF LOMITA; DON SUMINAGA; KEN BLACKWOOD; MARGARET ESTRADA; JAMES GAZELEY; HENRY SANCHEZ, JR.; MICHAEL SAVIDAN; BEN TRAINA; DOES 1- 10



## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

| I (a) PLAINTIFFS (Check box if you are representing yourself □)<br>ISLAMIC CENTER OF THE SOUTH BAY, LOS ANGELES | DEFENDANTS<br>CITY OF LOMITA; DON SUMINAGA; KEN BLACKWOOD; MARGARET ESTRADA; JAMES GAZELEY; HENRY SANCHEZ, JR.; MICHAEL SAVIDAN; BEN TRAINA; DOES 1-10 |
|---|---|
| (b) Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)<br>Hadsell Stormer Keeny Richardson & Renick, LLP<br>128 N. Fair Oaks Avenue, Pasadena, California 91103<br>Tel: (626) 585-9600/Fax: (626) 577-7079 | Attorneys (If Known)<br>Anne Richardson, Esq. (S.B. # 151541); arichardson@hskrr.com<br>Reem Salahi, Esq. (S.B. # 259711); reem@hskrr.com |

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff   ☒ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant   ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district (specify):   ☐ 6 Multi-District Litigation   ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☐ Yes  ☒ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☐ Yes  ☒ No   ☒ MONEY DEMANDED IN COMPLAINT: $ over $75,000

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
RLUIPA (42 U.S.C. §2000 cc et seq.); 42 U.S.C. §1983; Discrimination & substantial burden on religious exercise in denial of mosque land use application.

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS<br>PERSONAL INJURY | TORTS<br>PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 530 General | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 535 Death Penalty | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 540 Mandamus/ Other | ☐ 740 Railway Labor Act |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | BANKRUPTCY | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | ☐ 151 Medicare Act | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | FORFEITURE / PENALTY | PROPERTY RIGHTS |
| ☐ 490 Cable/Sat TV | | ☐ 355 Motor Vehicle Product Liability | CIVIL RIGHTS | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☐ 810 Selective Service | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☐ 850 Securities/Commodities/ Exchange | ☐ 160 Stockholders' Suits | ☐ 362 Personal Injury-Med Malpractice | ☐ 442 Employment | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 190 Other Contract | ☐ 365 Personal Injury-Product Liability | ☐ 443 Housing/Acco-mmodations | | SOCIAL SECURITY |
| ☐ 890 Other Statutory Actions | ☐ 195 Contract Product Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | ☐ 630 Liquor Laws | ☐ 861 HIA (1395ff) |
| ☐ 891 Agricultural Act | ☐ 196 Franchise | IMMIGRATION | ☐ 445 American with Disabilities - Employment | ☐ 640 R.R. & Truck | ☐ 862 Black Lung (923) |
| ☐ 892 Economic Stabilization Act | REAL PROPERTY | ☐ 462 Naturalization Application | ☐ 446 American with Disabilities - Other | ☐ 650 Airline Regs | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 893 Environmental Matters | ☐ 210 Land Condemnation | ☐ 463 Habeas Corpus-Alien Detainee | ☒ 440 Other Civil Rights | ☐ 660 Occupational Safety /Health | ☐ 864 SSID Title XVI |
| ☐ 894 Energy Allocation Act | ☐ 220 Foreclosure | ☐ 465 Other Immigration Actions | | ☐ 690 Other | ☐ 865 RSI (405(g)) |
| ☐ 895 Freedom of Info. Act | ☐ 230 Rent Lease & Ejectment | | | | FEDERAL TAX SUITS |
| ☐ 900 Appeal of Fee Determi-nation Under Equal Access to Justice | ☐ 240 Torts to Land | | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 950 Constitutionality of State Statutes | ☐ 245 Tort Product Liability | | | | ☐ 871 IRS-Third Party 26 USC 7609 |
| | ☐ 290 All Other Real Property | | | | |

**FOR OFFICE USE ONLY:**   Case Number: **CV12-2418**

AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
CIVIL COVER SHEET

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed?  ☑ No  ☐ Yes
If yes, list case number(s): _____

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case?  ☑ No  ☐ Yes
If yes, list case number(s): _____

Civil cases are deemed related if a previously filed case and the present case:
(Check all boxes that apply)  ☐ A. Arise from the same or closely related transactions, happenings, or events; or
☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or
☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or
☐ D. Involve the same patent, trademark or copyright, and one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named plaintiff resides.
☐  Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles | |

(b)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named defendant resides.
☐  Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles | |

(c)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH claim arose.
**Note: In land condemnation cases, use the location of the tract of land involved.**

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles | |

* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties
Note: In land condemnation cases, use the location of the tract of land involved.

X. SIGNATURE OF ATTORNEY (OR PRO PER): _____   Date March 20, 2012

**Notice to Counsel/Parties:**  The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |